IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Anadarko Petroleum Corporation and : 
Anadarko E&P Onshore LLC, : 
             Appellants : 
              : 
        v. : No. 58 C.D. 2018
              : ARGUED: November 14, 2018
Commonwealth of Pennsylvania; : 
Chesapeake Energy Corporation; : 
Chesapeake Appalachia, LLC; : 
Chesapeake Operating, LLC; : 
Chesapeake Energy Marketing, LLC : 


Chesapeake Energy Corporation; : 
Chesapeake Appalachia, LLC; : 
Chesapeake Operating, LLC; and : 
Chesapeake Energy Marketing, : 
L.L.C. : 
             Appellants : 
              : 
        v. : No. 60 C.D. 2018
              : 
Commonwealth of Pennsylvania : 

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE ROBERT SIMPSON, Judge
                HONORABLE P. KEVIN BROBSON, Judge
                HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE ELLEN CEISLER, Judge

OPINION BY JUDGE CEISLER              FILED: March 15, 2019

     In these combined interlocutory appeals by permission, we address two issues of first impression pertaining to Pennsylvania's Unfair Trade Practices and Consumer Protection Law (Law or UTPCPL).[1] The first is whether Appellee

---

[1] Act of December 17, 1968, P.L. 1224, *as amended*, 73 P.S. §§ 201-1—201-9.3.

Commonwealth of Pennsylvania, Office of Attorney General (Attorney General), can bring a cause of action against lessees pursuant to the UTPCPL, due to allegedly wrongful conduct perpetrated by the lessees in the context of leasing subsurface mineral rights from private landowners. The second issue is whether the Attorney General can bring a cause of action against those lessees, pursuant to the UTPCPL, for alleged violations of antitrust law. The Court of Common Pleas of Bradford County (Trial Court) answered both questions in the affirmative; however, after thorough consideration, we affirm in part and reverse in part.

The Attorney General filed suit in the Trial Court against Appellants Anadarko Petroleum Corporation and Anadarko E&P Onshore LLC (Anadarko), as well as Chesapeake Energy Corporation, Chesapeake Appalachia, LLC, Chesapeake Operating, LLC, and Chesapeake Energy Marketing, LLC (Chesapeake), (collectively, Appellants). In the complaint, the Attorney General alleges that, pursuant to both the UTPCPL and Pennsylvania antitrust common law, Appellants acted unlawfully by using deceptive, misleading, and unfair tactics, and committed antitrust violations, in their efforts to secure subsurface mineral rights leases from private landowners. *See* Second Amended Complaint at 1-4, 29-105.[2] These leases allow Appellants to extract natural gas from the Marcellus Shale formations underneath these private landowners' properties, in exchange for royalties and other types of payments. *Id.* at 14-28.

_____

[2] Black's Law Dictionary defines "antitrust law," in relevant part, as: "The body of law designed to protect trade and commerce from restraints, monopolies, price-fixing, and price discrimination." *Antitrust Law*, BLACK'S LAW DICTIONARY (10th ed. 2014), *available at* https://1.next.westlaw.com/Document/Ifdbf7970808411e4b391a0bc737b01f9/View/FullText.html. As discussed in more detail *infra*, the Attorney General alleges that Appellants committed antitrust violations by entering into joint venture and market sharing agreements, as well as by giving private landowners incomplete and misleading information that was materially relevant to the mineral rights leases.

The Attorney General alleges that Appellants agreed to split the portion of "northeast Pennsylvania within the Marcellus Shale gas play" between them, so that Anadarko and Chesapeake would each effectively have exclusive areas in which to seek mineral rights leases, without the fear that the other would tender competing offers to private landowners who were prospective lessors. *See* Second Amended Complaint at 62-76.

In response to the Attorney General's Second Amended Complaint, Appellants each filed preliminary objections. As part of their overall preliminary objections, Appellants made two arguments that are relevant to these interlocutory appeals. First, they demurred[3] on the basis that the Attorney General could not state claims against them under the UTPCPL, because this law could only be applied to address the allegedly deceptive or unfair conduct of *sellers* in the context of a consumer transaction. Anadarko's Preliminary Objections at 11; Chesapeake's Preliminary Objections at 2-3. Since they had leased subsurface mineral rights, Appellants argued that they were effectively *buyers* in these transactions, and that their conduct was thus not actionable under the terms of the UTPCPL. Anadarko's Preliminary Objections at 11-13; Chesapeake's Preliminary Objections at 3. Second, they demurred on the grounds that antitrust claims could not be made under the

---

[3] A demurrer tests the legal sufficiency of the complaint. . . . In ruling on preliminary objections, the courts must accept as true all well-pled allegations of material fact as well as all inferences reasonably deducible from the facts. . . . However, unwarranted inferences, conclusions of law, argumentative allegations or expressions of opinion need not be accepted. . . . For preliminary objections to be sustained, it must appear with certainty that the law will permit no recovery, and any doubt must be resolved in favor of the non-moving party.

*Christ the King Manor v. Dep't of Pub. Welfare*, 911 A.2d 624, 633 (Pa. Cmwlth. 2006), *aff'd*, 951 A.2d 255 (Pa. 2008).

UTPCPL, as this law was not designed to be an antitrust statute. Anadarko's Preliminary Objections at 28-32; Chesapeake's Preliminary Objections at 5-6.

The Trial Court sustained Appellants' Preliminary Objections in part and overruled them in part. Of relevance to these interlocutory appeals, the Trial Court held that the Attorney General could sue Appellants pursuant to the UTPCPL, since the companies were conducting trade or commerce, as those terms were defined in the Law, and determined that the Law permitted the Attorney General to pursue antitrust claims against these companies under the UTPCPL. Tr. Ct. Op. at 16-33, 47-50. After making these rulings, the Trial Court *sua sponte* certified these issues for interlocutory appeal, recognizing that they are questions of first impression in which different interpretations of the law were being debated. *Id.* at 73-75, 79, 81-82. Appellants then filed separate petitions for permission to appeal on an interlocutory basis,[4] which the Honorable Bonnie Brigance Leadbetter granted, consolidating Appellants' respective appeals and limiting them to the following two questions:

> 1. Whether a cause of action may be brought under the [UTPCPL] for alleged wrongful conduct by lessees in oil and gas lease transactions.
>
> 2. Whether a cause of action may be brought under the [UTPCPL] for alleged antitrust violations.

Commonwealth Court Order, 3/12/18, at 2-3. The parties subsequently filed responsive briefs and appeared for *en banc* argument. These issues are now ready for our consideration.[5]

---

[4] *See* Pa. R.A.P. 312, 1311, 1322 (allowing parties to request, and appellate courts to grant, interlocutory appeals by permission).

[5] Our standard of review regarding questions of statutory interpretation is "*de novo* and plenary." *Danganan v. Guardian Prot. Servs.*, 179 A.3d 9, 15 (Pa. 2018); *see also* 1 Pa. C.S. § 1921 (legislatively established standards for judicial interpretation of statutes).

## The UTPCPL

The Legislature sought by the [UTPCPL] to benefit the public at large by eradicating, among other things, 'unfair or deceptive' business practices. Just as earlier legislation was designed to equalize the position of employer and employee and the position of insurer and insured, this Law attempts to place on more equal terms seller and consumer. These remedial statutes are all predicated on a legislative recognition of the unequal bargaining power of opposing forces in the marketplace.

Instantly, the Legislature strove, by making certain modest adjustments, to ensure the fairness of market transactions. No sweeping changes in legal relationships were occasioned by the [Law], since prevention of deception and the exploitation of unfair advantage has always been an object of remedial legislation.

Although the [UTPCPL] did articulate the evils desired to be remedied, the statute's underlying foundation is fraud prevention. . . .

Since the [UTPCPL] was in relevant part designed to thwart fraud in the statutory sense, it is to be construed liberally to effect its object of preventing unfair or deceptive practices.

*Com., by Creamer v. Monumental Props., Inc.*, 329 A.2d 812, 815-17 (Pa. 1974) (footnotes and internal citations omitted).

Per the UTPCPL's express language, the General Assembly has "declared unlawful" 21 separate categories of "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[,]" as well as any acts or practices designated as such by the Attorney General through the administrative rulemaking process. Section 3 of the UTPCPL, 73 P.S. § 201-3; *see* Sections 2(4) and 3.1 of the UTPCPL, 73 P.S. §§ 201-2(4), 201-3.1.[6] Of relevance

---

[6] The Attorney General may adopt, after public hearing, such rules and regulations as may be necessary for the enforcement and

here is the subsection that prohibits "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." Section 2(xxi) of the UTPCPL, 73 P.S. § 201-2(xxi).

The Law defines "'trade' and 'commerce'" as "the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and includes any trade or commerce directly or indirectly affecting the people of this Commonwealth." Section 2(3) of the UTPCPL, 73 P.S. § 201-2(3). In addition, the UTPCPL authorizes actions by private parties and imbues the Attorney General, as well as district attorneys throughout this Commonwealth, with the power to file suit if they "[have] reason to believe that any person is using or is about to use any method, act or practice declared by [73 P.S. § 201-3] to be unlawful, and that proceedings would be in the public interest[.]" Section 4 of the UTPCPL, 73 P.S. § 201-4.

## The Attorney General's UTPCPL Claims Against Appellants

In this interlocutory appeal, Appellants argue that the Trial Court erred by holding that the Attorney General could sue them pursuant to the UTPCPL. According to Appellants, since they merely leased subsurface mineral rights from private landowners, they were not selling or distributing anything and consequently, the UTPCPL does not apply to their conduct, as the lease transactions do not satisfy the statutory definition of 'trade or commerce[.]'" Appellants' Br. at 13, 18-19.

---

administration of this act. Such rules and regulations when promulgated pursuant to the act of July 31, 1968 (P.L. 769, No. 240), [*as amended*, 45 P.S. §§ 1102-1602, and 45 Pa. C.S. §§ 501-907,] known as the "Commonwealth Documents Law," shall have the force and effect of law.

73 P.S. § 201-3.1, added by the Act of November 24, 2016, P.L. 1166.

Instead, Appellants contend that the UTPCPL is designed to only protect *consumers* against the underhanded behavior of sellers, rather than *all parties* to a given transaction. *Id.* at 13, 16-17.

In addition, Appellants maintain that the Trial Court erred in finding that these leases constituted "distribution of services," which is part of the definition of "'trade' and 'commerce'" found in 73 P.S. § 201-2(3). *Id.* at 19-20. Appellants argue that the Trial Court was bound by the Attorney General's averments in its Second Amended Complaint, which make clear "that the object of the lease arrangement was for [Appellants] and other gas companies to purchase outright landowners' interests in oil and gas deposits beneath the surface of their land." *Id.*

Furthermore, Appellants state that the Trial Court erred by finding that their conduct fell within the second clause of the UTPCPL's definition of "'trade' and 'commerce,'" which states, "'trade' and 'commerce' . . . includes any trade or commerce directly or indirectly affecting the people of this Commonwealth." *Id.* at 20-21; *see* 73 P.S. § 201-2(3). According to Appellants, the doctrine of *ejusdem generis*[7] requires this second clause to be read as referring to activities of the "same general nature or class" as those mentioned in the first clause[8] of Section 2(3) of the UTPCPL. Appellants' Br. at 21. Consequently, the Trial Court should not have used the ordinary definition of "'trade' and 'commerce'" when deciding whether Appellants' actions were trade or commerce for purposes of the Law, not only

---

[7] "Under our statutory construction doctrine *ejusdem generis* ('of the same kind or class'), where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated." *McClellan v. Health Maint. Org. of Pa.*, 686 A.2d 801, 806 (Pa. 1996).

[8] "'Trade' and 'commerce' mean the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate[.]" 73 P.S. § 201-2(3).

because of the doctrine of *ejusdem generis*, but also because reading the second clause as being independent would effectively render the first clause's narrower definition superfluous. *Id.* at 22-25.

We disagree. Contrary to Appellants' desired conclusion, we find that their conduct in relation to the aforementioned leases constitutes "'trade' and 'commerce,'" as those terms are understood in the context of the Law. As we have already noted, Section 2(3) of the UTPCPL states that

> 'Trade' and 'commerce' mean the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and includes any trade or commerce directly or indirectly affecting the people of this Commonwealth.

73 P.S. § 201-2(3).

Per this statutory language, and our case law, these leases were, in essence, sales. The Pennsylvania Supreme Court recognized long ago that residential leases are functionally equivalent to a property sale in many ways, and that residential leases fall within the scope of "'trade' and 'commerce'" under the UTPCPL. *See Monumental Props., Inc.*, 329 A.2d at 820-26. As the *Monumental Properties* court noted,

> there is substantial common-law authority that the leasing of property is identical to the sale of the premises. Dean Prosser accurately states the general rule:
>
> > 'When land is leased to a tenant, the law of property regards the lease as equivalent to a sale of the premises for the term.'
>
> W. Prosser, Handbook of the Law of Torts [§] 63, at 399 (4th ed. 1971) (footnote omitted).
>
> . . .
>
> Courts of other jurisdictions have considered leases as the sale of an interest in real estate, *e.g., Brenner v. Spiegle*,

8

116 Ohio St. 631, 632, 157 N.E. 491, 492—493 (1927), or as the 'sale of the possession, occupancy and profits of land for a term.' *Thiokol Chemical Corp. v. Morris County Board of Taxation*, 41 N.J. 405, 416, 197 A.2d 176, 182 (1964). Still other courts recognize that the lessee's interest is tantamount to absolute ownership of the premises for the term.

. . .

It is certainly the modern understanding of the common law of leases that '(a) tenant is a purchaser of an estate in land[.]' *Pines v. Perssion*, 14 Wis.2d 590, 594, 111 N.W.2d 409, 412 (1961).

*Id.* at 822-23 (some footnotes and citations omitted). We recognize that *Monumental Properties* focused upon residential leases, and stated that the UTPCPL "attempts to place on more equal terms seller and consumer." *Id.* at 816. However, given the General Assembly's intent that the Law be liberally interpreted, so as "to benefit the public at large by eradicating, among other things, 'unfair or deceptive' business practices[,]" *id.* at 815, we find that Section 2(3)'s express language covers business and commercial leases as well, not just those which involve consumers or are residential in nature. *See Danganan*, 179 A.3d at 16 ("[W]e recognize . . . the wide range of conduct the [UTPCPL] was designed to address, including equalizing the bargaining power of the seller and consumer, ensuring the fairness of market transactions, and preventing deception and exploitation, all of which harmonize with the statute's broad underlying foundation of fraud prevention.").

Here, under the terms of the at-issue leases, the private landowners effectively relinquish title to Appellants for natural gas that is extracted from their land during the lease term, in exchange for some combination of up-front and royalty payments. *See*, *e.g.*, Second Amended Complaint, Exs. G, H, Q. We fail to see how that is functionally different from a sale of property.

9

Furthermore, in *Danganan*, our Supreme Court interpreted Section 2(3) of the UTPCPL as containing two *distinct and independent* clauses, the latter of which "does not modify or qualify the preceding terms. 73 P.S. § 201–2(3). Instead, [the second clause] is appended to the end of the [first clause's] definition and [is] prefaced by 'and includes,' thus indicating an inclusive and broader view of trade and commerce than expressed by the antecedent language." *Danganan*, 179 A.3d at 16. Therefore, this second clause operates as a catch-all of sorts, enabling "'trade' and 'commerce'" to be defined in terms of common usage and not just, as argued by Appellants, through the narrower, more specific language of the first clause. *See* 1 Pa. C.S. § 1903(a).[9] "Pennsylvania courts generally use dictionaries as source material to determine the common and approved usage of terms not defined in statutes." *THW Grp., LLC v. Zoning Bd. of Adjustment*, 86 A.3d 330, 343 (Pa. Cmwlth. 2014). Consequently, we turn to Merriam-Webster's Dictionary, which defines "trade" and "commerce," in relevant part and respectively as, "the business of buying and selling or bartering commodities"[10] and "the exchange or buying and selling of commodities on a large scale involving transportation from place to place."[11]

---

[9] "Words and phrases shall be construed according to rules of grammar and according to their common and approved usage; but technical words and phrases and such others as have acquired a peculiar and appropriate meaning or are defined in this part, shall be construed according to such peculiar and appropriate meaning or definition." 1 Pa. C.S. § 1903(a).

[10] "Trade." Merriam-Webster.com. https://www.merriam-webster.com/dictionary/trade (last visited March 12, 2019).

[11] "Commerce." Merriam-Webster.com. https://www.merriam-webster.com/dictionary/commerce (last visited March 12, 2019).

Again, Appellants have, by virtue of leasing subsurface mineral rights, purchased time-limited rights to whatever natural gas is situated underneath the private landowners' properties. Thus, these transactions are, in the context of the UTPCPL, "'trade' or 'commerce'."[12]

Having decided that Appellants' leases qualify under the Law as "'trade' or 'commerce'," the question then becomes whether this type of activity can give rise to a UTPCPL action by the Attorney General. We find that it can. As noted above, the UTPCPL states that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by subclauses (i) through (xxi) of [73 P.S. § 201-2] and regulations promulgated under [73 P.S. § 201-3.1] are hereby declared unlawful." 73 P.S. § 201-3. The key phrase here is "in the conduct," which, when read in the full context of the language used in Section 3 of the UTPCPL, pertains to *all* "[u]nfair methods of competition and unfair or deceptive acts or practices" connected to UTPCPL-defined "'trade' or 'commerce'," regardless of who is committing these unlawful acts.

Additionally, while the UTPCPL places restrictions on the ability of private parties to file suit,[13] the Law creates no such impediment for the Attorney General.

---

[12] Because of our holding that these leases are "sales," within the context of Section 2(3)'s first clause, and "'trade' or 'commerce'," within the context of Section 2(3)'s second clause, we do not address Appellants' argument that the Trial Court erred in ruling that the leases constitute "'trade' or 'commerce'" because they qualify as "distribution of services."

[13] Sections 7(a) and 9.2(a)-(b) of the UTPCPL limit private actions to those initiated by buyers, consumers, and lessees:

> (a) Where goods or services having a sale price of twenty-five dollars ($25) or more are sold or contracted to be sold to a buyer, as a result of, or in connection with, a contact with or call on the buyer or resident at his residence either in person or by telephone, that consumer may avoid the contract or sale by notifying, in writing, the seller within three full business days following the day on which the

11

Instead, the Attorney General is imbued with the express authority to file suit against "any person," whenever the Attorney General determines that such a person "is using or is about to use any method, act or practice declared by [73 P.S. § 201-3] to be unlawful, and that proceedings would be in the public interest[.]" 73 P.S. § 201-4. Section 2(2) of the Law defines "person" as "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities." *Id.* at § 201-2(2). Given that the Appellants are comprised of various corporations and other legal entities, they are thus subject to suit under the UTPCPL.

Tying this all together, the Attorney General has asserted that Appellants, which are UTPCPL-classified "persons," have operated deceptively, misleadingly,

---

> contract or sale was made and by returning or holding available for return to the seller, in its original condition, any merchandise received under the contract or sale. Such notice of rescission shall be effective upon depositing the same in the United States mail or upon other service which gives the seller notice of rescission.

73 P.S. § 201-7(a).

> (a) Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by [73 P.S. § 201-3], may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper. The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees.

> (b) Any permanent injunction, judgment or order of the court made under [73 P.S. § 201-4] shall be prima facie evidence in an action brought under [73 P.S. § 201-9.2] that the defendant used or employed acts or practices declared unlawful by [73 P.S. § 201-3].

*Id.* § 201-9.2(a)-(b), added by the Act of November 24, 2016, P.L. 1166.

12

and unfairly "in the conduct of any trade or commerce" (*i.e.*, the leasing of subsurface mineral rights from private landowners). Second Amended Complaint at 1-4, 29-78, 82-105; 73 P.S. § 201-3; *see* 73 P.S. § 201-2(4)(xxi) (defining "'[u]nfair methods of competition'" and 'unfair or deceptive acts or practices'[,]" in relevant part, as "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding"). Therefore, the Attorney General has stated legally viable claims against Appellants. For these reasons, we hold that the Trial Court properly overruled Appellants' demurrers that their behavior in securing these leases was not actionable under the UTPCPL.

### The Attorney General's Antitrust Actions under the UTPCPL

Appellants argue that the Trial Court erred in ruling that the Attorney General could use the UTPCPL to pursue claims against them that were rooted in alleged violations of antitrust law. Appellants note that the UTPCPL "does not prohibit joint ventures or in any way purport to regulate or penalize agreements among businesses[,]" such as those entered into by Appellants during their efforts to secure the aforementioned leases. Appellants' Br. at 13-14, 29. Instead, Appellants assert that the Attorney General is simply attempting to "retroactively and unilaterally" rewrite the UTPCPL, in order to get around the General Assembly's repeated failure to pass an antitrust statute, and the fact that damages are not recoverable under Pennsylvania antitrust common law. *Id.* at 13-14, 27-32.

According to Appellants, "[n]either the 'trade or commerce' definition in [73 P.S.] § 201-2(3) nor the catchall provision in [73 P.S.] § 201-2(4)(xxi) addresses agreements between market participants or in any other way purports to regulate competition." *Id.* at 29. Appellants note that the UTPCPL contains specific statutory definitions of "unfair methods of competition" and "unfair or deceptive acts or

13

practices" that do not include joint venture agreements, such as the kind in which Appellants were involved. Appellants' Reply Br. at 16-17. Appellants opine that this is what differentiates the UTPCPL from federal antitrust statutes such as the Federal Trade Commission (FTC) Act, 15 U.S.C. §§ 41-58, which contains no definition of "unfair methods of competition" and "unfair or deceptive acts or practices" and, thus, renders unlawful a far broader swath of activities than the UTPCPL.[14] *Id.* at 16-18. Consequently, Appellants conclude that the General Assembly's intent that the UTPCPL be liberally construed should not be interpreted in a way that disregards the plain language of the Law or permits the creation of antitrust provisions that are not explicitly contained within the UTPCPL. Appellants' Br. at 32-33.

We agree with Appellants that the UTPCPL is not designed to render *all* antitrust violations actionable and that the scope of actionable antitrust behavior under the UTPCPL is narrower than under federal antitrust law. As we have already noted, the UTPCPL provides two avenues through which activities can be declared "unfair methods of competition" or "unfair or deceptive acts or practices." First, the General Assembly may define a given activity as unlawful by statute in Section 2(4) of the Law. Second, the Attorney General, by virtue of Section 3.1 of the Law, may also promulgate definitions of these terms through the administrative rulemaking process. 73 P.S. § 201-3.1. Given that neither the Attorney General nor the General Assembly has thus far used their powers to expressly define monopolistic behavior, joint ventures, or market sharing agreements as examples of "unfair methods of competition" or "unfair or deceptive acts or practices," we find that such activities are not *per se* unlawful for purposes of the UTPCPL. Consequently, the only manner

---

[14] Section 5 of the FTC Act merely states: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful." 15 U.S.C. § 45(a)(1).

in which these activities can give rise to viable UTPCPL actions is if they fit within one of the categories of behavior deemed, by rule or in the Law itself, "unfair methods of competition" or "unfair or deceptive acts or practices."

The Attorney General's Second Amended Complaint contains two claims which allege antitrust violations by Appellants under the UTPCPL. The first can be discerned in Count III, in which the Attorney General asserts that Appellants' allegedly unlawful joint venture and market sharing agreements violated the UTPCPL through "impairment of choice and the competitive process[.]" Second Amended Complaint at 65-67. According to the Attorney General, these agreements "created the likelihood of confusion and misunderstanding" amongst the private landowners under whose land the desired natural gas was situated, by eliminating the prospect of competition between potential lessees and depressing the amount of compensation the landowners received in return for leasing their land to Appellants. *Id.* at 66-70.

Thus, the Attorney General essentially argues through Count III that Appellants' joint venture and market sharing agreements *intrinsically* violated the UTPCPL. As we have already explained, the plain terms of the UTPCPL do not support such a conclusion. Rather, the Attorney General's claim that the mere existence of these business dealings created "impairment of choice and the competitive process" is insufficient and does not enable Count III to fit within any of the 21 categories of "unfair methods of competition" or "unfair or deceptive acts or practices" listed in Section 2(4) of the Law. Furthermore, the Attorney General has thus far declined to deem joint ventures or market sharing agreements as "unfair methods of competition" or "unfair or deceptive acts or practices" under the UTPCPL through the administrative rulemaking process. Consequently, the

15

Attorney General has failed to state a viable UTPCPL-based antitrust claim in Count III, and, therefore, the Trial Court erred by overruling Appellants' demurrers to Count III of the Attorney General's Second Amended Complaint.

The second UTPCPL-based antitrust claim can be discerned in Count IV, in which the Attorney General argues that Appellants deceived and acted unfairly towards private landowners by giving them misleading information, and/or failing to disclose information, regarding the open market's true appetite for subsurface mineral rights leases, as well as whether the terms of the agreed-to leases "were competitive and fair." *Id.* at 72-76.

With regard to Count IV, however, we find that the Attorney General has articulated a legally viable UTPCPL claim. The Attorney General's assertions in Count IV regarding Appellants' allegedly disingenuous and misleading behavior brings that claim within the ambit of Section 2(4)(xxi) of the Law, which defines "'[u]nfair methods of competition' and 'unfair or deceptive acts or practices'" as "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4)(xxi). Hence, the Trial Court did not err by overruling Appellants' demurrers to Count IV of the Attorney General's Second Amended Complaint.

## Conclusion

In summation, we hold that the Attorney General was permitted to file a UTPCPL-based lawsuit against Appellants, but can only pursue antitrust claims through the UTPCPL where the so-called "antitrust" conduct qualifies as "unfair methods of competition" or "unfair or deceptive acts or practices," as those terms have been either statutorily defined in the UTPCPL or by the Attorney General through the administrative rulemaking process. Thus, in light of the requirement that,

16

in order to sustain a demurrer, "it must appear with certainty that the law will permit no recovery, and any doubt must be resolved in favor of the non-moving party[,]" *Christ the King Manor*, 911 A.2d at 633, we reverse the Trial Court regarding its decision to overrule Appellants' demurrers to Count III of the Attorney General's Second Amended Complaint, but otherwise affirm the Trial Court. Furthermore, we direct Appellants to each file an Answer to the Second Amended Complaint within 20 days of this matter's record being returned to the Trial Court.[15]

_____
ELLEN CEISLER, Judge

Judges Brobson and McCullough concur in result only.
Judge Fizzano Cannon did not participate in the decision of this case.

---

[15] We note that Chesapeake filed an Application for Relief on September 14, 2018, bringing to our attention the Attorney General's August 11, 2018, draft proposed UTPCPL rulemaking, through which the Attorney General, in relevant part, articulated its desire to define "sale" as encompassing both selling and purchasing, as well as to define "unfair methods of competition and unfair or deceptive acts or practices" as including market sharing agreements. Chesapeake's Application for Relief at 2-4; *id.*, Ex. A at 12-13. Chesapeake requests that we "take judicial notice of the Attorney General's admissions in the [d]raft [p]roposed [r]ulemaking that the UTPCPL does not 'clearly' or 'plainly' authorize claims against buyers like Chesapeake or provide a cause of action based on alleged market allocation arrangements." Application for Relief at 4-5. In keeping with our broader holding in this matter, we deny Chesapeake's Application for Relief.

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Anadarko Petroleum Corporation and  :
Anadarko E&P Onshore LLC,     :
               Appellants    :
                             :
        v.               :  No. 58 C.D. 2018
                             :
Commonwealth of Pennsylvania;   :
Chesapeake Energy Corporation;   :
Chesapeake Appalachia, LLC;     :
Chesapeake Operating, LLC;      :
Chesapeake Energy Marketing, LLC  :


Chesapeake Energy Corporation;    :
Chesapeake Appalachia, LLC;     :
Chesapeake Operating, LLC; and    :
Chesapeake Energy Marketing,     :
LLC                  :
               Appellants    :
                             :
        v.               :  No. 60 C.D. 2018
                             :
Commonwealth of Pennsylvania   :

## **O R D E R**

AND NOW, this 15th day of March, 2019, the December 15, 2017 order of the Court of Common Pleas of Bradford County (Trial Court) is AFFIRMED IN PART, regarding the Trial Court's ruling that Appellee Commonwealth of Pennsylvania, Office of Attorney General (Attorney General), may bring causes of action under the Unfair Trade Practices and Consumer Protection Law (UTPCPL), Act of December 17, 1968, P.L. 1224, *as amended*, 73 P.S. §§ 201-1—201-9.3, against Appellants Anadarko Petroleum Corporation; Anadarko E&P Onshore LLC;

Chesapeake Energy Corporation; Chesapeake Appalachia, LLC; Chesapeake Operating, LLC; and Chesapeake Energy Marketing, LLC (collectively Appellants), and has stated a legally viable UTPCPL claim in Count IV of its Second Amended Complaint, and REVERSED IN PART, regarding the Trial Court's ruling that the Attorney General has stated a legally viable UTPCPL claim in Count III of its Second Amended Complaint.

It is FURTHER ORDERED that Chesapeake Energy Corporation, Chesapeake Appalachia, LLC, Chesapeake Operating, LLC, and Chesapeake Energy Marketing, LLC's Application for Relief is DENIED.

It is FURTHER ORDERED that this matter is REMANDED to the Trial Court. Appellants shall have twenty (20) days, calculated from the date this matter's record is returned to the Trial Court, in which to file Answers to the Attorney General's Second Amended Complaint.

Jurisdiction relinquished.

_____
ELLEN CEISLER, Judge

Anadarko Petroleum Corporation and : 
Anadarko E&P Onshore LLC, : 
              Appellants : 
 : 
         v. : 
 : 
Commonwealth of Pennsylvania; : 
Chesapeake Energy Corporation; : 
Chesapeake Appalachia, LLC; : 
Chesapeake Operating, LLC; :   No. 58 C.D. 2018
Chesapeake Energy Marketing, LLC :   Argued: November 14, 2018


Chesapeake Energy Corporation; : 
Chesapeake Appalachia, L.L.C.; : 
Chesapeake Operating, L.L.C.; and : 
Chesapeake Energy Marketing, L.L.C., : 
              Appellants : 
 : 
         v. : 
 :   No. 60 C.D. 2018
Commonwealth of Pennsylvania : 


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
             HONORABLE ROBERT SIMPSON, Judge
             HONORABLE P. KEVIN BROBSON, Judge
             HONORABLE PATRICIA A. McCULLOUGH, Judge
             HONORABLE ANNE E. COVEY, Judge
             HONORABLE MICHAEL H. WOJCIK, Judge
             HONORABLE ELLEN CEISLER, Judge


CONCURRING AND DISSENTING OPINION
BY JUDGE COVEY                 FILED: March 15, 2019


       I concur with the Majority that the Bradford County Common Pleas Court (trial court) erred by overruling the demurrers of Anadarko Petroleum Corporation and Anadarko E&P Onshore LLC, Chesapeake Energy Corporation,

Chesapeake Appalachia, LLC, Chesapeake Operating, LLC, and Chesapeake Energy Marketing, LLC (Chesapeake Appellants), (collectively, Appellants) to Count III of the Attorney General's Second Amended Complaint. However, I do not agree that the Attorney General has stated legally viable claims against Appellants, as lessees, under the Unfair Trade Practices and Consumer Protection Law (UTPCPL).[1] Because the Majority manipulates the language of the UTPCPL for a purpose the General Assembly never intended and, as a result, Appellants find themselves facing liability for conduct that, prior to the Majority's pronouncement, neither Appellants (nor anyone else) could have foreseen would be considered a violation of state law, I respectfully dissent from those portions of the Majority opinion.

The UTPCPL is a **consumer** protection statute. The Pennsylvania Supreme Court has recognized that

> [t]he UTPCPL was created to even the **bargaining power between consumers and sellers** in commercial transactions, and to promote that objective, **it aims to protect the <u>consumers</u>** of the Commonwealth against fraud and unfair or deceptive business practices. As a remedial statute, it is to be construed liberally to effectuate **that goal**.

*Commonwealth v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010, 1023 (Pa. 2018) (citation omitted; bold and underline emphasis added).

In *Meyer v. Community College of Beaver County*, 93 A.3d 806 (Pa. 2014), our Supreme Court explained, "the legislature enacted the UTPCPL to account for the fundamental inequality between buyer and seller, and to **protect *consumers* from exploitative *merchants***." *Id.* at 814 (bold and italic emphasis added). In *Commonwealth v. Monumental Properties, Inc.*, 329 A.2d 812 (Pa. 1974), the Pennsylvania Supreme Court stated that

---

[1] Act of December 17, 1968, P.L. 1224, *as amended*, 73 P.S. §§ 201-1 - 201-9.3.

the [UTPCPL] was designed **to equalize the market position and strength of the consumer vis-a-vis the seller**. A perception of unfairness led the Legislature to regulate more closely market transactions. **The mischief to be remedied was the use of unfair or deceptive acts and practices** *by sellers*. As part of the [UTPCPL's] object, fraudulent conduct that would mislead or confuse a **consumer** was banned.

*Id.* at 820 (bold and italic emphasis added). The *Monumental Properties* Court recognized: "The Legislature directed that **consumers** were to be safeguarded by the [UTPCPL]. . . . [T]enants are in every meaningful sense consumers." *Id*. at 826 (emphasis added).

Based thereon, the Majority acknowledges that lessee Appellants are **purchasers**, *i.e.*, consumers of "time-limited rights to whatever natural gas is situated underneath the private landowners' properties."[2] Majority Op. at 10-11; *see also* Majority Op. at 9 (recognizing that the lease transactions are not "functionally different from a sale of property"). Conversely, the private landowners were sellers in the subject transactions.

Appellants correctly observe:

No court has ever interpreted the UTPCPL as authorizing a claim by or on behalf of a seller *against* a person who acquires something from the seller or as separately authorizing a right of action against a person simply

---

[2] The Attorney General acknowledged in the Second Amended Complaint:

An oil and gas lease is a misnomer as it operates as a fee simple determinable for the mineral estate[;] [a] fee simple determinable for the mineral estate operates to sever the ownership of certain minerals from the ownership of the surface of the land[; and t]he mineral estate **conveyed by Pennsylvania Landowners** typically includes all geologic horizons including, but not limited to, Marcellus Shale and Utica Shale.

Second Amended Complaint, ¶¶ 77-79, Reproduced Record at 980a (emphasis added).

because that person is involved in any form of commercial transaction.[3]

Chesapeake Appellants' Br. at 25.

Section 3 of the UTPCPL declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." 73 P.S. § 201-3. Section 2(3) of the UTPCPL defines "trade" and "commerce" as "the advertising, **offering for sale, sale or distribution** of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, **and includes any trade or commerce directly or indirectly affecting the people of this Commonwealth**." 73 P.S. § 201-2(3) (emphasis added). Notwithstanding that Section 2(3) of the UTPCPL specifically defines trade or commerce as "offering for sale, sale or distribution" (*i.e.*, the act of **selling**), the Majority, citing to the Pennsylvania Supreme Court's decision in *Danganan v. Guardian Protection Services*, 179 A.3d 9 (Pa. 2018), interprets the definition's second clause (which describes but does not limit what selling includes) to apply to the act of **purchasing**. The Majority misreads *Danganan*.

---

[3] The UTPCPL describes *only* unlawful activity by a **seller, and provides protections for buyers**. *See*, *e.g.*, Section 2(4) of the UTPCPL, 73 P.S. § 201-2(4) (defining "[u]nfair methods of competition" and "unfair or deceptive acts or practices"); *see also* Section (5) of the UTPCPL, 73 P.S. § 201-5 (permitting the Attorney General to accept an assurance of voluntary compliance by stipulation "for voluntary payment by the alleged violator providing for the restitution by the alleged violator **to consumers**, of money, property or other things received from them in connection with a violation of [the UTPCPL]." (emphasis added)); Section 7 of the UTPCPL, 73 P.S. § 201-7 (providing **buyers** under a contract for $25 or more, a 3-day cancellation period, requiring particular information and notice to be provided to the buyer, and requiring a seller to honor such cancellation within 10 business days); Section 9.2 of the UTPCPL, *as amended*, added by Section 1 of the Act of November 24, 1976, P.L. 1166, 73 P.S. § 201-9.2 (creating a private cause of action for "[a]**ny person who *purchases* or *leases*** goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal" by a UTPCPL violation) (emphasis added); Section 9.3 of the UTPCPL, *as amended*, added by Section 1 of the Act of June 25, 1997, P.L. 287, 73 P.S. § 201-9.3 (providing dog **purchaser protection** and imposing obligations on the seller).

AEC - 4

The issue before the Court in *Danganan* was whether a non-Pennsylvania resident could maintain a cause of action against a Pennsylvania-headquartered business, based on out-of-state transactions. The Court considered the text of Section 2(3) of the UTPCPL, explaining that

> the plain language definitions of 'person' and 'trade' and 'commerce' evidence no geographic limitation or residency requirement relative to the [UTPCPL's] application. **Although the trade and commerce definition includes a clause relating to conduct that 'directly or indirectly affect[s] the people of this Commonwealth,' that phrase does not modify or qualify the preceding terms.** 73 P.S. § 201-2(3). Instead, it is appended to the end of the definition and prefaced by 'and includes,' thus indicating an inclusive and broader view of trade and commerce than expressed by the antecedent language. *See id.* (defining those terms as 'the advertising, offering for sale, sale or distribution of any services and any property, . . . and any other article, commodity, or thing of value wherever situate, and includes any trade or commerce directly or indirectly affecting the people of this Commonwealth').

*Danganan*, 179 A.3d at 16 (emphasis added). The *Danganan* Court held that, given the General Assembly's use of the words "and includes," the second clause description **did not *limit*** the first clause only to "trade or commerce directly or indirectly affecting the people of this Commonwealth." 73 P.S. § 201-2(3). Because the UTPCPL describes "the advertising, offering for sale, sale or distribution of any services and any property" to **include** "any trade or commerce affecting the people of this Commonwealth[,]" it is logical that the Supreme Court did not read the first clause to apply to **only** "trade or commerce affecting the people of this Commonwealth." 73 P.S. § 201-2(3).

Here, the Majority incorrectly construes *Danganan* to justify its disregard of the first clause in the UTPCPL's definition of "trade" or "commerce." Rather than concluding that the first clause is not limited by the second, as the

Supreme Court in *Danganan* did, the Majority concludes that the second clause is not limited by the first. This interpretation completely ignores the General Assembly's use of the words "and includes" and renders the first clause unnecessary. 73 P.S. § 201-2(3). Perhaps best demonstrating the error of the Majority's approach, the Majority consults the dictionary for the definition of "trade" and "commerce" notwithstanding that the UTPCPL already defines "trade" and "commerce" in the first clause. "The legislature may create its own dictionary, and its definitions may be different from ordinary usage. **When it does define the words used in a statute**, **the courts** need not refer to the technical meaning and derivation of those words as given in dictionaries, but **must accept the statutory definitions.**" *Commonwealth v. Massini*, 188 A.2d 816, 817 (Pa. Super. 1963) (emphasis added); *see also Commonwealth v. Lobiondo*, 462 A.2d 662, 664 (Pa. 1983). Here, although the statute defines the terms "trade" and "commerce," the Majority nevertheless disregards the statutory definition in favor of the dictionary definition, which it may not do. By ignoring this well-established principle, the Majority erroneously concludes that the UTPCPL "pertains to *all* '[u]nfair methods of competition and unfair or deceptive acts or practices' connected to UTPCPL-defined ''trade' or 'commerce',' **regardless of who is committing these unlawful acts**[,]" and authorizes a UTPCPL action against Appellants, the **consumers** in the commercial transaction. Majority Op. at 11 (bold emphasis added).

I believe that the Majority misconstrues the terms "trade" and "commerce" as used in Section 2(3) of the UTPCPL in a way that is wholly inconsistent with the UTPCPL's legislative purpose. Thereby, the Majority holds that the UTPCPL, a consumer protection statute intended to bolster consumers' bargaining powers, can authorize legal action **against a purchaser**. "It is a primary canon of construction that statutes must be construed in such a way as to effectuate the legislative purpose and policy." *Commonwealth v. Wanamaker*, 296 A.2d 618,

AEC - 6

623 (Pa. 1972). "The most basic tenet of statutory construction is that **a court must effectuate the intent of the General Assembly.**" *Gardner v. Workers' Comp. Appeal Bd. (Genesis Health Ventures)*, 888 A.2d 758, 761 (Pa. 2005) (emphasis added). The Majority's holding completely ignores the legislative purpose and erroneously relies on a dictionary definition, thereby undermining the General Assembly's intent. Consequently, the Majority has overstepped its authority by ignoring the statutory definition of "trade" or "commerce" and substituting a definition that directly conflicts with the legislature's purpose to protect **consumers**.

Further, the Majority's "trade" and "commerce" interpretation conflicts with Pennsylvania Superior Court decisions *Schwarzwaelder v. Fox*, 895 A.2d 614 (Pa. Super. 2006) and *DeFazio v. Gregory*, 836 A.2d 935 (Pa. Super. 2003), wherein the Court held that the UTPCPL served to protect buyers rather than sellers. The *Schwarzwaelder* Court held that where plaintiffs did not purchase from the defendant, the UTPCPL is inapplicable.

Recently, the Pennsylvania Superior Court explained:

The UTPCPL is for **consumer** protection. It undoes the ills of sharp business dealings by vendors, who, as here, may be counseling consumers in very private, highly technical concerns. . . . [T]hose consumers may be especially reliant upon a vendor's specialized skill, training, and experience in matters with which consumers have little or no expertise. **Therefore, the legislature has placed the duty of UTPCPL compliance *squarely and solely on vendors*; they are not to engage in deceitful conduct and have no legally cognizable excuse, if they do.**

*Gregg v. Ameriprise Fin., Inc.*, 195 A.3d 930, 940 (Pa. Super. 2018) (bold and italic emphasis added). Although *Schwarzwaelder, DeFazio* and *Gregg* involved lawsuits by private parties rather than the Attorney General, all such actions are confined to the UTPCPL's definition of "trade" and "commerce," which applies both to actions

by the Attorney General and by private parties. Thus, the aforementioned cases are instructive.

By imposing a **consumer** protection statute's restrictions, prohibitions and burdens **on consumers**, the Majority's analysis and ruling is a gross misinterpretation and misapplication of the UTPCPL. Such ruling is inconsistent with the UTPCPL's statutory purpose, creates a never-intended or anticipated UTPCPL cause of action that is completely contrary to the General Assembly's intent, and creates a dangerous precedent.

With respect to Count IV, the second UTPCPL-based antitrust claim, the Second Amended Complaint alleges therein that Appellants violated the UTPCPL:

> a. Each time a[n Appellant] failed to disclose the existence of the joint venture agreement, the market allocation agreement and the option of the other [Appellant] to acquire an interest in the lease in the course of negotiating an oil and gas lease with a Pennsylvania Landowner within the area of mutual interest covering the Marcellus Shale gas play;
>
> b. Each time a Pennsylvania Landowner received an artificially deflated acreage signing bonus from a[n Appellant]; and
>
> c. Each time a Pennsylvania Landowner received an artificially deflated royalty from a[n Appellant].

Reproduced Record (R.R.) at 1034a-1035a. The Majority concludes that the claim which clearly targets an alleged restraint of trade falls "within the ambit of Section 2(4)(xxi) of the Law,[4]" given the "Appellants' allegedly disingenuous and misleading behavior . . . ." Majority Op. at 16.[5]

---

[4] 73 P.S. § 201-2(4)(xxi).

[5] For the reasons previously discussed, I believe that Count IV of the Second Amended Complaint must also be dismissed since Appellants' conduct, as purchasers, does not fall within the UTPCPL's definition of "trade" and "commerce."

AEC - 8

Appellants properly argue:

> The UTPCPL does not provide on its face any remedy for alleged antitrust violations. . . . Neither the 'trade or commerce' definition in [Section] 2(3) [of the UTPCPL,] nor the catchall provision in [Section] 2(4)(xxi) [of the UTPCPL] addresses agreements between market participants or in any other way purports to regulate competition.

Chesapeake Appellants' Br. at 29. Appellants also correctly observe that the "Pennsylvania General Assembly has tried *24 times* to pass an antitrust statute that would have provided a remedy for alleged anticompetitive practices since the enactment of the UTPCPL in 1968, but each time the measure has failed."[6] Chesapeake Appellants' Br. at 30-31; *see also,* R.R. at 675a.

---

[6] Appellants' exhibit listed **25** bills. The last bill, Senate Bill 578 of 2015, was described as still pending. On August 29, 2017, Senator Greenleaf reintroduced Senate Bill 578 of 2015 as Senate Bill 858 P.N. 1122 of 2017 (Senate Bill 858), and it was referred to the Senate Judiciary Committee on the same date. Thus, there have been 26 attempts – none yet successful. Senator Greenleaf's May 26, 2017 Memorandum describing Senate Bill 858 provides in pertinent part:

> In consultation with the Office of Attorney General, I am reintroducing **Senate Bill 578**, a comprehensive antitrust law.
> . . . .
> The legislation authorizes only the Attorney General to file a civil action for an antitrust violation. The purpose of the law is to allow for a full and fair recovery to satisfy claims arising from an antitrust injury sustained by the Commonwealth and its residents and to provide the investigative tools to satisfactorily achieve this objective. The language is derived from other states' statutes and federal law.
>
> *The legislation is intended to make illegal any contract, conspiracy or combination in restraint of trade and any monopolization in restraint of trade.* The legislation also makes illegal any mergers or acquisitions that lessens competition substantially in any line of commerce. The legislation provides for criminal penalties for obstructing compliance with a subpoena and for knowingly removing or falsifying documents to be produced. Any such obstruction or falsification constitutes a misdemeanor of the second degree.

AEC - 9

There is no dispute that the General Assembly has not enacted a state antitrust statute. By affirming the trial court's decision to overrule Appellants' demurrers to Count IV, the Majority erroneously interprets the UTPCPL to create a statutory prohibition unapproved by the General Assembly, and wields that unauthorized and un-enacted prohibition to punish **consumers** under the purported authority of a **consumer** protection statute. <u>This is judicial overreach.</u>

"[C]ourts may not legislate[.]" *Willman v. Children's Hosp. of Pittsburgh*, 459 A.2d 855, 858 (Pa. Cmwlth. 1983), *aff'd*, 479 A.2d 452 (Pa. 1984); *see also Spectrum Arena Ltd. P'ship v. Commonwealth*, 983 A.2d 641 (Pa. 2009); *Benson v. Patterson*, 830 A.2d 966 (Pa. 2003); *Martin v. Soblotney*, 466 A.2d 1022 (Pa. 1983); *Pa. State Police, Bureau of Liquor Control Enf't v. Can, Inc.*, 651 A.2d 1160 (Pa. Cmwlth. 1994). "**[I]t is not the role of the judiciary to legislate changes in the law which our legislature has declined to adopt**." *Garney v. Estate of Hain*, 653 A.2d 21, 21 (Pa. Super. 1995) (emphasis added).

> [An appellate] court is constrained from [legislating] by the nature of the judicial role in our governmental system. We are not the promulgator of statutory law, only its interpreter. We seek to divine the intent of the legislature and apply it in a given situation. Judges who overstep the bounds of their authority become Platonic Commissioners, a role which is anathema to our democratic system.

*In Interest of R.M.R.*, 530 A.2d 1381, 1389-90 (Pa. Super. 1987). "[An appellate court's] role is to interpret the laws as enacted by the General Assembly." *Williams*

---

The legislation incorporates exemptions that are judicially recognized under federal antitrust laws. The Commonwealth Court would have original jurisdiction for all actions for violations of the statute.

https://www.legis.state.pa.us//cfdocs/Legis/CSM/showMemoPublic.cfm?chamber=S&SPick=20170&cosponId=24006 (last visited March 8, 2019) (italic emphasis added).

This memorandum explicitly acknowledges that there is currently no state antitrust statute and, thus, "contract, conspiracy or combination in restraint of trade and any monopolization in restraint of trade" are not currently prohibited under state law. *Id.*

*v. GEICO Gov't Emps. Ins. Co.*, 32 A.3d 1195, 1209 (Pa. 2011).[7]  As then-Chief Justice Castille recognized in his dissent in *Commonwealth v. Wilgus*, 40 A.3d 1201, 1209 (Pa. 2012) (Castille, C.J., dissenting), "[t]he consequences of statutory interpretation can affect citizens in a myriad of ways, including: their professions and business relationships, their property, their personal wealth, their freedom of movement, and most seriously, their very freedom itself."  The United States Supreme Court has explained that "[a] fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *Fed. Commc'ns Comm'n  v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  I find it unconscionable that as the direct result of the Majority's decision, Appellants may be retroactively liable for engaging in conduct that was not considered to be violative of state law at the time such activities occurred.  For these reasons, I would also hold that the trial court erred by overruling Appellants' demurrers to Count IV of the Attorney General's Second Amended Complaint.

---

[7] The Pennsylvania Supreme Court emphasized:

> 'Judicial power, as contra distinguished from the power of the laws, has no existence.  Courts are mere instruments of the law and can will nothing. . . .  Judicial power is never exercised for the purpose of giving effect to the will of the Judge; always for the purpose of giving effect to the will of the Legislature; in other words, to the will of the law.' *Osborn v. President, Dir*[*s.*] [*&*] *Co*[.] *of Bank of* [*U.S.*] (Chief Justice Marshall), 9 Wheaton 738, 866, 6 L.Ed. 204 [(U.S. 1824)].  The situation complained of may only be cured by the legislature.  It is not for us to legislate or by interpretation to add to legislation matters which the legislature saw fit not to include.

*Commonwealth ex rel. Fox v. Swing*, 186 A.2d 24, 26-27 (Pa. 1962).

I, therefore, respectfully dissent from those portions of the Majority opinion.

_____
ANNE E. COVEY, Judge