**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | No. 81 MAP 2019 |
| | : | |
| | : | Appeal from the Order of the |
| v. | : | Commonwealth Court at No. 58 CD |
| | : | 2018 dated March 15, 2019 |
| | : | Affirming in Part and Reversing in |
| CHESAPEAKE ENERGY CORPORATION; | : | Part the Order of the Bradford |
| CHESAPEAKE APPALACHIA, L.L.C.; | : | County Court of Common Pleas, |
| CHESAPEAKE OPERATING, L.L.C.; | : | Civil Division, at No. 2015IR0069 |
| CHESAPEAKE ENERGY MARKETING, | : | dated December 15, 2017 and |
| L.L.C.; ANADARKO PETROLEUM | : | Remanding. |
| CORPORATION; AND ANADARKO E&P | : | |
| ONSHORE, L.L.C. | : | ARGUED:  May 27, 2020 |
| | : | |
| | : | |
| APPEAL OF:  ANADARKO PETROLEUM | : | |
| CORPORATION; AND ANADARKO E&P | : | |
| ONSHORE, L.L.C. | : | |


**OPINION**


JUSTICE MUNDY                                          **DECIDED:  March 24, 2021**

In this appeal by allowance, we consider whether the Commonwealth, by the Office of Attorney General (OAG), may bring claims under the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL), 73 P.S. §§ 201-1—201-9.3, on behalf of private landowners against a natural gas exploration and production company for its alleged deceptive, misleading, and unfair practices in obtaining natural gas leases from the landowners.  We also consider whether the OAG may pursue antitrust remedies against a natural gas extractor under the UTPCPL.  Because we conclude neither of the

OAG's theories are cognizable under the UTPCPL, we affirm in part and reverse in part the order of the Commonwealth Court.

## I. PENNSYLVANIA'S UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

Enacted in 1968, the UTPCPL is Pennsylvania's consumer protection law.[1] "The UTPCPL was created to even the bargaining power between consumers and sellers in commercial transactions, and to promote that objective, it aims to protect the consumers of the Commonwealth against fraud and unfair or deceptive business practices." *Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010, 1023 (Pa. 2018); *see also Commonwealth, by Creamer v. Monumental Props., Inc.*, 329 A.2d 812, 816-18 (Pa. 1974) (noting the UTPCPL's "underlying foundation is fraud prevention," and it was based on the Federal Trade Commission Act, 15 U.S.C. §§ 41-58, and the Lanham Trademark Act, 15 U.S.C. §§ 1051-1127). As a remedial statute, "the UTPCPL is to be liberally construed to effectuate its objective of protecting the consumers of this Commonwealth from fraud and unfair or deceptive business practices." *Ash v. Cont'l Ins. Co.*, 932 A.2d 877, 881 (Pa. 2007).

Turning to the UTPCPL's language and structure, Section 3 declares unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by [Section 2(4)(i)-(xxi)] and regulations promulgated [by the Attorney General] under section 3.1[.]" 73 P.S. § 201-3. As alluded to in Section 3, Section 2(4) defines "'unfair methods of competition' and 'unfair or deceptive acts or practices'" by providing a list of 20 specific actions that sellers are prohibited from engaging in, "which might be analogized to passing off, misappropriation, trademark infringement, disparagement, false advertising, fraud, breach of contract, and breach of

---

[1] Act of December 17, 1968, P.L. 1224, No. 387, (as amended 73 P.S. §§ 201-1—201-9.3).

warranty." *Gabriel v. O'Hara*, 534 A.2d 488, 494 (Pa. Super. 1987) (footnotes omitted); 73 P.S. § 201-2(4)(i)-(xx).   In addition to these 20 specific actions, Section 2(4)(xxi) contains a "catch-all" provision against "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."  73 P.S. § 201-2(4)(xxi).

Section 3 prohibits those "unfair methods of competition and unfair or deceptive acts or practices" in "trade or commerce."  73 P.S. § 201-3.  In this case, we focus on Section 2(3), which defines the terms "'trade' and 'commerce'" as "the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and includes any trade or commerce directly or indirectly affecting the people of this Commonwealth."  73 P.S. § 201-2(3).

To enforce Section 3, the UTPCPL provides,

> Whenever the Attorney General or a District Attorney has reason to believe that any person is using or is about to use any method, act or practice declared by [Section 3] to be unlawful, and that proceedings would be in the public interest, he [or she] may bring an action in the name of the Commonwealth against such person to restrain by temporary or permanent injunction the use of such method, act or practice.

73 P.S. § 201-4.  Additionally, the UTPCPL authorizes "any person who purchases or leases goods or services," and who is a victim of "a method, act or practice declared unlawful by section 3" to "bring a private action, to recover actual damages or one hundred dollars ($100), whichever is greater."  73 P.S. § 201-9.2.  In such private actions, a court has the discretion to impose treble damages, costs, and attorney fees.  *Id.*

## II. FACTUAL AND PROCEDURAL HISTORY

Anadarko Petroleum Corporation and Anadarko E&P Onshore, L.L.C. (Anadarko) conducted natural gas exploration and production in the Marcellus Shale formation in the northeastern Pennsylvania counties of Bradford, Centre, Clinton, Lycoming, Potter, Sullivan, Tioga, and Wyoming. Second Amended Complaint, 5/3/16, at ¶¶ 261-262.[2] To acquire oil and gas interests, Anadarko employed or contracted with "landmen," who in turn negotiated and entered into leases with Pennsylvania landowners to obtain their properties' mineral estates. *Id.* at ¶¶ 72, 269. In a typical oil and gas lease, a landowner conveys the mineral estate for a term of years to an exploration and production company in exchange for signing bonus payments, royalties from the sale of oil and gas extracted from the land, and, at times, protections of surface rights. *Id.* at ¶¶ 28-30, 72, 74. Further, the landmen had the ability to alter the standard pre-printed lease form to address a landowner's demands through various addenda or even by editing the lease document on a laptop word processing program. *Id.* at ¶¶ 80-104; *see also, e.g.*, *id.* at 100 ("[t]he exploration and production companies gave such permission depending on the value of the land owned by the hard-bargaining landowner"). Although these agreements were referred to as "leases," the landowner conveyed a fee simple to the mineral estate for a term of years, which severed the ownership of certain minerals from ownership of the property's surface. *Id.* ¶¶ 77-78; *Snyder Bros., Inc. v. Peoples Nat. Gas Co.*, 676 A.2d 1226, 1230 (Pa. Super. 1996) ("the interest granted to lessee is a fee simple determinable; the lessor retains a reversionary interest."); *see also Shedden v. Anadarko E. & P. Co., L.P.*, 136 A.3d 485, 490 (Pa. 2016) ("[a]n oil and gas lease is in the nature of a contract, and, thus, is controlled by principles of contract law.").

---

[2] As we are reviewing rulings on preliminary objections in the nature of demurrers, we take as true all material facts pled in the complaint, and any reasonable inferences deduced therefrom. *Golden Gate*, 194 A.3d at 1022.

In 2006, Anadarko entered into a joint venture with other companies engaged in natural gas exploration and production in the Marcellus Shale formation, Chesapeake Energy Corporation, Chesapeake Appalachia, L.L.C., Chesapeake Operating, L.L.C., and Chesapeake Energy Marketing, L.L.C. (Chesapeake). Second Amended Complaint, 5/3/16, ¶ 206. This joint venture included an oral market allocation agreement whereby Anadarko and Chesapeake allotted the territories in which they acquired oil and gas leases amongst themselves. *Id.* at ¶ 211. Specifically, Anadarko allocated to Chesapeake the counties of Bradford, Sullivan, Tioga, and Wyoming. *Id.* at ¶ 212. In return, Chesapeake allocated Clinton, Lycoming, and Potter Counties to Anadarko. *Id.* ¶ 213. Additionally, each company had the option of partnering on the leases secured by the other company. *Id.* at ¶ 214. Anadarko's landmen did not disclose these agreements with Chesapeake to prospective lessors. *Id.* at ¶ 216. The alleged effect of the Anadarko-Chesapeake joint venture was to eliminate competition in the negotiation of lease terms, including the signing bonus and royalty amounts to landowners. *Id.* at ¶¶ 217-19.

The OAG, acting as *parens patriae*,[3] filed this lawsuit against Anadarko and Chesapeake[4] pursuant to the UTPCPL "to restrain unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce declared

---

[3] *Parens patriae* is "[a] doctrine by which a government has standing to prosecute a lawsuit on behalf of a citizen, esp. on behalf of someone who is under a legal disability to prosecute the suit[.]" *Parens Patriae*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[4] On June 28, 2020, Chesapeake filed a Chapter 11 bankruptcy case in the United States Bankruptcy Court for the Southern District of Texas. On July 22, 2020, the bankruptcy court granted Chesapeake's emergency motion for entry of an order enforcing the automatic stay against the OAG. As a result, this Court issued an order on August 26, 2020, taking notice of the bankruptcy court's decision that the automatic stay applies to Chesapeake's appeal in this Court and severing Chesapeake from this appeal. Order, 8/26/2020, at 2 (per curiam). Accordingly, we consider the appeal of Anadarko only. *Id.*

unlawful by Section 3 of the UTPCPL." *Id.* at 1-2.[5]  The OAG sought "to recover for Pennsylvania Landowners money wrongfully deducted from royalty checks as a result of the wrongful conduct of Defendants[.]"  *Id.* at ¶ 1.  Specifically, in its first count against Anadarko (Count III), the OAG averred that the joint venture and market allocation agreements Anadarko entered into with Chesapeake were unlawful under UTPCPL Section 3 because they "impaired the competitive process which deprived Pennsylvania Landowners from receiving an acreage signing bonus and royalty which would have been competitive and fair absent the agreement to allocate territories."  *Id.* at ¶ 225.  In its second and third counts  against Anadarko (Counts IV and VI), the OAG alleged Anadarko's conduct in the joint venture and in its individual capacity were unlawful under UTPCPL Section 3 because it "constituted unfair or deceptive acts or practices within the meaning of Section 2(4) of the UTPCPL, including" subsections 2(4)(ii), (v), (vii), and (xxi). *Id.* at ¶¶ 245, 309.

Anadarko filed preliminary objections to the second amended complaint.  Relevant to this appeal, Anadarko argued that the three counts in the OAG's complaint were legally insufficient because the UTPCPL applies only to sellers in consumer transactions, and Anadarko did not sell anything to the landowner when it entered into an oil and gas lease. Anadarko's First Amended Consolidated Preliminary Objections, 10/5/16, at ¶¶ 31-41. Instead, Anadarko explained it purchased the landowner's mineral rights.  *Id.* at ¶ 40; *see also id.* at ¶¶ 43-44 (arguing the subsections of the UTPCPL the OAG cited in its complaint, 73 P.S. § 201-2(4)(ii), (v), (vii), (xxi), did not apply because they involved the

---

[5] The OAG filed its initial complaint on December 9, 2015.  On January 15, 2016, the OAG filed an amended complaint, and it filed its second amended complaint on May 3, 2016.  In addition to the UTPCPL claims, the OAG asserted an antitrust common law claim based on the common law doctrine against unreasonable restraints of trade. Second Amended Complaint, 5/3/16, ¶¶ 248-58 (Count V).  As this common law claim is outside the scope of the issues on which we granted allowance of appeal, we do not discuss it.

sale or lease of consumer goods or services).  Additionally, Anadarko asserted that the OAG's allegations of an "oral market allocation agreement" in Count IV are not cognizable under the UTPCPL because the UTPCPL does not create a cause of action for antitrust damages.  *Id.* at ¶¶ 81-83.

On December 15, 2016, the trial court overruled Anadarko's preliminary objections. The trial court concluded the UTPCPL applied because Anadarko's purchasing of oil and gas rights constituted "trade and commerce" as defined in UTPCPL Section 2(3).  Trial Ct. Op., 12/15/16, at 21.  It read the UTPCPL Section 2(3) definition of "trade and commerce" as containing two independent parts, namely: (1) "the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate," and (2) "includes any trade or commerce directly or indirectly affecting the people of this Commonwealth."  *Id.*; 73 P.S. § 201-2(3).  The trial court concluded Anadarko's oil and gas leasing met both clauses because: (1) the purchase of an oil and gas lease was a "distribution of services;" and (2) the purchase of an oil and gas lease constituted "any trade or commerce."  *Id.* at 21-25 (applying *Monumental Props.*).  The trial court also overruled Anadarko's preliminary objection that antitrust claims are not cognizable under the UTPCPL because the OAG's allegations of anticompetitive conduct in the joint venture agreement were "sufficient to survive a demurrer[.]"  *Id.* at 70.

In its opinion and accompanying orders denying the preliminary objections, the trial court *sua sponte* identified and certified two issues for immediate interlocutory appeal pursuant to 42 Pa.C.S. § 702(b): (1) whether the OAG may bring claims under the UTPCPL in this case; and (2) whether the OAG's antitrust allegations are cognizable under the UTPCPL "catchall" provision in Section 2(4)(xxi).  *Id.* at 73-75; *see also* Trial Ct. Order, 1/11/18, at 2 (amending 12/15/17 order to also certify for immediate appeal

Anadarko's preliminary objection demurring to the UTPCPL antitrust claim). Anadarko filed a petition for permission to appeal on an interlocutory basis, which the Commonwealth Court granted and consolidated with Chesapeake's appeal. *Anadarko Petroleum Corp. v. Commonwealth*, 206 A.3d 51, 54 (Pa. Cmwlth. 2019) (en banc).

The Commonwealth Court, en banc, affirmed in part and reversed in part the trial court order overruling Anadarko's preliminary objections. *Id.* at 53. The court affirmed the trial court's conclusion that the OAG's UTPCPL claims based on Anadarko's conduct in securing oil and gas leases were "legally viable." *Id.* at 59. The court reasoned that Anadarko's conduct constituted "'trade' and 'commerce'" under UTPCPL Section 2(3) because the "leases were, in essence, sales." *Id.* at 56. To support this conclusion, the court applied *Monumental Properties*, in which this Court concluded residential leases are sales that are regulated by the UTPCPL. *Id.* at 57 (analogizing *Monumental Props.*, 329 A.2d at 822-23). The Commonwealth Court extended *Monumental Properties* to business and commercial leases, and it further explained that the oil and gas leases were tantamount to the sale of property because "under the terms of the at-issue leases, the private landowners effectively relinquish title to [Anadarko] for natural gas that is extracted from their land during the lease term, in exchange for some combination of up-front and royalty payments." *Id.*

The Commonwealth Court then noted that in *Danganan v. Guardian Protection Services*, 179 A.3d 9 (Pa. 2018), this Court explained the Section 2(3) definition of trade and commerce contained "two distinct and independent clauses." *Id.* (relying on *Danganan*, 179 A.3d at 16); *see also* 73 P.S. § 201-2(3) ("'trade' and 'commerce' mean the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and includes any trade or commerce directly or indirectly

affecting the people of this Commonwealth.").  Based on *Danganan*'s statement that the second clause—beginning with "and includes"—in the Section 2(3) definition contains "an inclusive and broader view of trade and commerce than expressed by the antecedent language," *Danganan*, 179 A.3d at 16, the Commonwealth Court concluded the "second clause operates as a catch-all of sorts, enabling ''trade' and 'commerce'' to be defined in terms of common usage and not just . . . through the narrower, more specific language of the first clause."  *Anadarko Petroleum*, 206 A.3d at 57.  Accordingly, the Commonwealth Court used the Merriam-Webster's Dictionary definitions of "trade" and "commerce," both of which include the "buying and selling" of commodities.  *Id.* at 58.  Based on these dictionary definitions, the court concluded Anadarko engaged in trade and commerce when it entered into the leases to purchase landowners' subsurface mineral rights.  *Id.*

After concluding Anadarko was engaged in trade and commerce when it purchased mineral rights through leases, the Commonwealth Court then concluded these lease transactions can give rise to a UTPCPL claim because Section 3 outlaws all "'[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.'"  *Id.* (quoting 73 P.S. § 201-3).  Therefore, the court concluded that the OAG stated cognizable UTPCPL claims against Anadarko and affirmed the trial court's decision overruling Anadarko's preliminary objections.  *Id.* at 59.

Turning to the issue of whether the OAG's antitrust claims were cognizable under the UTPCPL, the Commonwealth Court concluded that the UTPCPL does not render all antitrust violations actionable, but antitrust violations "can give rise to viable UTPCPL actions [] if they fit within one of the categories of behavior deemed, by rule or in the Law itself, 'unfair methods of competition' or 'unfair or deceptive acts or practices.'"  *Id.* at 60. Applying this, the court found the UTPCPL antitrust claim in Count III of the second amended complaint, which averred that the joint venture and market sharing agreements

intrinsically violated the UTPCPL, was not legally viable because conduct generally impairing competition did not fit into any of the 21 categories of conduct Section 2(4) describes. *Id.* Accordingly, the Commonwealth Court reversed the trial court's order overruling Anadarko's preliminary objections to Count III. *Id.* at 61.

In contrast to Count III, the Commonwealth Court found Count IV pled a legally viable UTPCPL-based antitrust claim. *Id.* The court concluded Count IV's allegations that Anadarko acted unfairly and deceptively by misleading landowners about the market's true demand for mineral rights and about the fairness and competitiveness of the lease terms fit the UTPCPL catch-all provision of Section 2(4)(xxi), "'[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.'" *Id.* (quoting 73 P.S. § 201-2(4)(xxi)). Therefore, the Commonwealth Court affirmed the trial court's order overruling Anadarko's preliminary objections to Count IV.[6]

Judge Anne Covey filed a concurring and dissenting opinion in which she agreed with the majority that the trial court erred in overruling Anadarko's preliminary objection to Count III and dissented from the majority's holding that the OAG pled legally viable UTPCPL claims. *Id.* at 62 (Covey, J., concurring and dissenting). Judge Covey emphasized that the UTPCPL is a consumer protection statute. *Id.* (quoting *Golden Gate*, 194 A.3d at 1023 (stating the UTPCPL "aims to protect the consumers"); *Meyer v. Cmty. Coll. of Beaver County*, 93 A.3d 806, 814 (Pa. 2014) (explaining "the legislature enacted the UTPCPL to account for the fundamental inequality between buyer and seller, and to protect consumers from exploitative merchants.")). She explained that in extending the UTPCPL to residential leases, the *Monumental Properties* Court reasoned that "[t]he

---

[6] Judges Brobson and McCullough concurred in the result only, without filing opinions. Judge Fizzano Cannon did not participate in the decision.

Legislature directed that consumers were to be safeguarded by the [UTPCPL]. . . . [T]enants are in every meaningful sense consumers." *Id.* at 63 (quoting *Monumental Props.*, 329 A.2d at 826). However, she noted that in the oil and gas lease transactions in this case, the majority and the OAG acknowledged that Anadarko was the purchaser/consumer and the landowners were the sellers. *Id.*

Judge Covey observed that the language of UTPCPL Section 2(3) defines trade and commerce exclusively as acts of selling, *i.e.*, "advertising, offering for sale, sale or distribution." *Id.* at 64 (quoting 73 P.S. § 201-2(3)). She then criticized the majority for concluding Section 2(3) encompassed purchasing by misreading *Danganan*. *Id.* Judge Covey explained that the *Danganan* Court held a non-Pennsylvania resident could bring a UTPCPL action against a Pennsylvania business based on out-of-state transactions by concluding that the Section 2(3) definition of trade and commerce contains two clauses, and "the second clause description **did not *limit*** the first clause only to 'trade or commerce directly or indirectly affecting the people of this Commonwealth.' 73 P.S. § 201-2(3)." *Id.* (emphasis in original). However, instead of concluding the first clause, "the advertising, offering for sale, sale or distribution of any services and any property . . . ," was not limited by the second, Judge Covey viewed the majority as concluding the second clause's use of "trade and commerce" was not limited by the first clause's definition of those same terms. *Id.* She faulted the majority for using *Danganan* to disregard the statutory definition of "trade" and "commerce" and instead using dictionary definitions. *Id.* at 65 (relying on *Commonwealth v. Massini*, 188 A.2d 816, 817 (Pa. Super. 1963) (stating that when the legislature defines words, courts must accept those definitions and cannot substitute dictionary definitions)).

Additionally, Judge Covey opined that the majority's definition was inconsistent with the legislative purpose of protecting consumers and that it conflicted with the

Superior Court's decisions holding the UTPCPL protects buyers and not sellers. *Id.* at 65-66 (discussing *Gregg v. Ameriprise Fin., Inc.*, 195 A.3d 930, 940 (Pa. Super. 2018) (holding vendors have a duty to comply with the UTPCPL in interacting with consumers), *appeal granted*, 216 A.3d 222 (Pa. 2019); *Schwarzwaelder v. Fox*, 895 A.2d 614, 619 (Pa. Super. 2006) (holding the UTPCPL did not apply because the plaintiffs did not purchase from the defendant); and *DeFazio v. Gregory*, 836 A.2d 935, 939 (Pa. Super. 2003) (holding the UTPCPL protects buyers not sellers)). Accordingly, Judge Covey dissented from the majority's decision permitting the OAG to bring a UTPCPL case on behalf of the sellers in a transaction against the buyers. *Id.* at 66.

Although Judge Covey opined her conclusion that the Section 2(3) definition of trade and commerce did not apply to Anadarko's conduct as a purchaser meant that all of the OAG's UTPCPL claims must be dismissed, including the antitrust claims, she also found the majority's reading of the UTPCPL as covering antitrust claims was an act of improper judicial legislation. *Id.* at 66 n.5, 67. Accordingly, Judge Covey concluded that she would hold the trial court erred in overruling Anadarko's demurrers to Count IV. *Id.* at 68.

## III. ISSUES AND STANDARD OF REVIEW

This Court granted Anadarko's petition for allowance of appeal to consider the following issues:

> (1) Are the claims by the Commonwealth, brought on behalf of private landowners against natural gas extractors alleging that the extractors used deceptive, misleading, and unfair tactics in securing natural gas leases from landowners, cognizable under the Unfair Trade Practices and Consumer Protection Law?

> (2) May the Commonwealth pursue antitrust remedies under the Unfair Trade Practices and Consumer Protection Law?

*Commonwealth v. Chesapeake Energy Corp.*, 218 A.3d 1205 (Pa. 2019) (per curiam) (rephrasing issues for clarity).

As these issues present pure legal questions of statutory interpretation, our standard of review is de novo, and our scope of review is plenary. *MERSCORP, Inc. v. Del. County*, 207 A.3d 855, 861 (Pa. 2019). In construing a statute, a court's duty is to give effect to the legislature's intent and to give effect to all of the statute's provisions. 1 Pa.C.S. § 1921(a). The plain language of the statute is the best indicator of the legislature's intent. *Crown Castle NG E. LLC v. Pa. Pub. Util. Comm'n*, ___ A.3d ___, 2020 WL 4152006, at *6 (Pa. July 21, 2020). To ascertain the plain meaning, we consider the operative statutory language in context and give words and phrases their common and approved usage. *Id.* Courts must give effect to a clear and unambiguous statute and cannot disregard the statute's plain meaning to implement its objectives. *Id.* "Only if the statute is ambiguous, and not explicit, do we resort to other means of discerning legislative intent." *Matter of Private Sale of Prop. by Millcreek Twp. Sch. Dist.*, 185 A.3d 282, 291 (Pa. 2018).

## IV. LEGAL SUFFICIENCY OF UTPCPL CLAIMS

## A. PARTIES' ARGUMENTS

Anadarko asks us to reverse the Commonwealth Court's holding that the OAG's UTPCPL claims are legally cognizable. Anadarko's Brief at 17. Anadarko emphasizes that the legislative purpose of the UTPCPL is to protect consumers from sellers' wrongful conduct. *Id.* at 18, 20 ("The UTPCPL is designed to regulate the conduct of sellers in order to protect buyers in consumer transactions. It was not intended to regulate the conduct of buyers entering into private contracts with sellers.").

Anadarko argues the UTPCPL's plain language confirms the legislative intent to protect buyers. *Id.* at 21. First, Anadarko highlights that Section 2(3) defines "trade" and

"commerce" as the acts of "advertising, offering for sale, sale or distribution," which are activities of exclusively sellers. *Id.* at 20-21 (quoting 73 P.S. § 201-2(3)). Second, all of the enumerated unlawful trade practices in Section 2(4) "protect buyers from sellers, whether explicitly through references to 'sell' or 'sales,' or implicitly by describing activities undertaken by sellers." *Id.* Anadarko emphasizes that it was acting as a buyer/purchaser in the oil and gas lease transactions that form the basis of the OAG's UTPCPL claims, a fact that both the OAG's second amended complaint and the Commonwealth Court's opinion acknowledged. *Id.* at 8 (citing Second Amended Complaint, 5/3/16, at 63-64), 17, 22-23 (quoting *Anadarko Petroleum*, 206 A.3d at 57). Because the plain language of the UTPCPL regulates only sellers, Anadarko claims the OAG cannot bring UTPCPL actions against it based on its conduct as a purchaser. *Id.* at 24.

Anadarko identifies two flaws in the Commonwealth Court's interpretation of the UTPCPL. First, Anadarko asserts that the court erred in disregarding the clear statutory definition of "trade" and "commerce." *Id.* at 25. Because the legislature supplied a definition of those terms, Anadarko maintains a court may not disregard that definition and instead resort to a dictionary definition. *Id.* Further, "[w]ords and phrases should be presumed to bear the same meaning throughout a statutory provision absent clear intent to the contrary, particularly where the term is repeated within a given sentence." *Id.* at 26-27 (citing, among other cases, *Ratzlaf v. U.S.*, 510 U.S. 135, 143 (1994) ("A term appearing in several places in a statutory text is generally read the same way each time it appears.")). According to Anadarko, the Commonwealth Court erred in disregarding the legislative definition of trade and commerce in Section (3).

The second error Anadarko points out is that the Commonwealth Court misconstrued the second part of the Section 2(3) definition of trade and commerce. *Id.* at 27. Again, the second part states "'trade' and 'commerce' . . . includes any trade or

commerce directly or indirectly affecting the people of this Commonwealth." 73 P.S. § 201-2(3). Anadarko posits that converting this second part into a "catch-all of sorts, enabling 'trade' and 'commerce' to be defined in terms of common usage," as the Commonwealth Court did, renders the first part superfluous. Anadarko's Brief at 27-28 (quoting *Anadarko Petroleum*, 206 A.3d at 57). Anadarko asserts that reading the second part as regulating all aspects of a transaction subsumes the first clause, which limits the definition of trade and commerce to "advertising, offering for sale, sale, or distribution," *i.e.*, selling goods. *Id.* at 28; 73 P.S. § 201-2(3). Further, Anadarko explains that *Danganan* confirms its construction of the trade and commerce definition because the *Danganan* Court stated "[a]lthough the trade and commerce definition includes a clause relating to conduct that 'directly or indirectly affect[s] the people of this Commonwealth,' that phrase does not modify or qualify the preceding terms." *Danganan*, 179 A.3d at 16; Anadarko's Brief at 29; *see also Anadarko Petroleum*, 206 A.3d at 64 (Covey, J., concurring and dissenting) (discussing *Danganan*). Thus, Anadarko maintains the Commonwealth Court erred in employing the second part of Section 2(3) to expand the scope of the UTPCPL to permit purchasers to bring actions against buyers/consumers.

Anadarko argues this Court's decision in *Monumental Properties* supports its interpretation that the UTPCPL protects only buyers in commercial transactions. Anadarko's Brief at 30. It notes that the *Monumental Properties* Court held that the UTPCPL applies to residential leases because landlords are akin to sellers and tenants are akin to buyers of property. *Id.* (citing *Monumental Props.*, 329 A.2d at 820). Anadarko posits that the analysis of the *Monumental Properties* Court, analogizing tenants to consumers, would not be necessary if the second part of Section 2(3)'s definition of "trade or commerce" applied to all commercial transactions, as the Commonwealth Court held in this case. *Id.* at 31. Further, Anadarko reads *Monumental Properties* as holding

residential leases are a type of consumer transaction because the landlord was selling property, and not as applying the UTPCPL to all lessees. *Id.* at 31-32. Anadarko distinguishes *Monumental Properties* from this case because the landowner was the seller of oil and gas interests, and Anadarko was the buyer of those interests. *Id.* at 32.

Lastly, Anadarko argues "[t]he Legislature has not amended the UTPCPL to expand the definition of 'in the conduct of any trade or commerce' to cover the nature of private contracts at issue here, and it is not the function of the courts to do so." *Id.* at 35. Anadarko contends the Commonwealth Court subverted the limitations the legislature chose to place on the UTPCPL as a law designed to protect consumers in commercial transactions.[7] *Id.* Accordingly, Anadarko asks us to reverse the Commonwealth Court's holding that the OAG's UTPCPL claims were legally cognizable. *Id.* at 37.

In contrast, the OAG advocates for affirmance of the Commonwealth Court's broad definition of "trade" and "commerce" as including Anadarko's leasing of oil and gas interests to extract natural gas for commercial sale. OAG Brief at 21, 27. The OAG contends that courts must liberally construe the UTPCPL. *Id.* at 27 (relying on *Monumental Props.*, 329 A.2d at 817 (stating the UTPCPL "is to be construed liberally to effect its object of preventing unfair or deceptive practices.")). Accordingly, the OAG

---

[7] Amici curiae, The Pennsylvania Coalition for Civil Justice Reform, The Pennsylvania Bankers Association, The National Federation of Independent Business, and The Insurance Federation of Pennsylvania (collectively PCCJR), express concern that the Commonwealth Court's decision permits the OAG to apply the UTPCPL broadly to all business-to-business transactions and contracts. PCCJR Amici Brief at 11-12. Additionally, amici curiae, Marcellus Shale Coalition, Pennsylvania Independent Oil & Gas Association, and American Petroleum Institute (collectively MSC), note that the legislature has regulated the oil and gas industry outside of the UTPCPL and has not indicated that the UTPCPL regulates oil and gas leases. MSC Amici Brief at 12-13 (referring to the Oil and Gas Lease Act, 58 P.S. §§ 33.1-35.4; and the Recording of Surrender Documents from Oil and Gas Lease Act, 58 P.S. § 901-905).

asserts that Anadarko, which bought and sold property interests, and produced and sold natural gas, conducted "trade and commerce" as defined by Section 2(3).

To support its construction of Section 2(3), the OAG relies on *Danganan*. *Id.* at 28. The OAG characterizes the Section 2(3) definition of trade and commerce as consisting of two parts: (1) "the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate;" and (2) "includes any trade or commerce directly or indirectly affecting the people of this Commonwealth." *Id.* (quoting 73 P.S. § 201-2(3)). The OAG reads *Danganan* as instructing that "the second part of this definition does not modify or qualify the first part." *Id.* Instead, "'it is appended to the end of the definition and prefaced by 'and includes,' thus indicating an inclusive and broader view of trade and commerce than expressed by the antecedent language.'" *Id.* at 28-29 (quoting *Danganan*, 179 A.3d at 16). Based on this statement, the OAG reads *Danganan* as suggesting that "the second part of the definition is a catch-all provision." *Id.* at 29. The OAG implicitly argues the catch-all nature of the second part enables it to define "trade and commerce" in terms of common usage, and it defines those terms as "the business of buying and selling for money." *Id.* (relying on *May v. Sloan*, 101 U.S. 231, 237 (1879); *U.S. v. Besser Mfg. Co.*, 96 F.Supp. 304, 307 (E.D. Mich. 1951), *aff'd*, 343 U.S. 444 (1952)). Therefore, the OAG maintains Anadarko engaged in trade and commerce for the purposes of the UTPCPL. *Id.* at 30.

Additionally, the OAG emphasizes that UTPCPL Section 4 authorizes the OAG to bring a public enforcement action against any "person" for violations of the UTPCPL.[8] *Id.* The OAG contrasts Section 4 with Sections 7 and 9.2, which provide rights for

---

[8] The UTPCPL defines "person" as "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities." 73 P.S. § 201-2(2).

buyers/consumers against sellers.  *Id.* at 31-32.  Because Section 4 is not limited to actions against sellers, the OAG maintains the UTPCPL authorizes it to bring enforcement actions against any person who engages in unfair and deceptive trade practices.  *Id.* at 32-33.  Accordingly, the OAG urges us to affirm the Commonwealth Court's decision that its UTPCPL claims are legally cognizable.  *Id.* at 33.

Anadarko disputes the OAG's position that the UTPCPL regulates all business conduct.  Anadarko's Reply Brief at 3.  Anadarko reminds that the issue is whether it engaged in trade or commerce under Section 2(3), not whether it engaged in business activities generally.  *Id.* at 5.  Further, Anadarko criticizes the OAG for suggesting that we can define trade or commerce differently from the definition the legislature supplied.  *Id.* at 6 (citing, among others, *Commonwealth v. King*, 939 A.2d 877, 880 (Pa. 2007); *Allegheny County Sportsmen's League v. Rendell*, 860 A.2d 10, 20 (Pa. 2004) (stating courts may construe terms according to common usage "[i]n the absence of a specific statutory definition.")).  Instead, Anadarko contends we cannot discard the legislative definition of trade or commerce as the acts of "the advertising, offering for sale, sale or distribution . . . ."  *Id.*

Responding to the OAG's reliance on Section 4, Anadarko argues that section gives the OAG standing to bring an enforcement action against "any person" only if that person violates Section 3, *i.e.*, engages in "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  *Id.* at 7-8.  Anadarko maintains that its alleged leasing practices did not constitute trade or commerce, so Section 4 does not provide a basis for the OAG to bring an action against it.  *Id.* at 8.

Lastly, Anadarko maintains there is not a "catch-all" definition of trade or commerce in Section 2(3).  *Id.* at 9.  Instead, Section 2(3) provides a single definition of trade or

commerce as "advertising, offering for sale, sale or distribution." *Id.* at 10. Construing the definition's second part—"and includes any trade or commerce directly or indirectly affecting the people of this Commonwealth"—broadly enough to encompass any economic activity would render the first part superfluous and irrelevant. *Id.* Anadarko contends that *Monumental Properties* supports its position because the *Monumental Properties* Court recognized that the definition of trade or commerce limits the conduct covered by the UTPCPL, even giving it a liberal construction. *Id.* Further, Anadarko points out that while the *Danganan* Court recognized the second part of the definition was broad, the Court did not construe the second part of the definition to nullify the first. *Id.* at 11. Therefore, Anadarko asks us to reject the OAG's position that there is a second, broad definition of trade or commerce. *Id.*

**B. ANALYSIS**

The UTPCPL clearly regulates the conduct of sellers, and it does not provide a remedy for sellers to exercise against buyers. Section 3 of the UTPCPL declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce[.]" 73 P.S. § 201-3. To resolve this appeal, we focus on the Section 2(3) definition of trade and commerce, which provides:

> **"Trade" and "Commerce"** mean the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and includes any trade or commerce directly or indirectly affecting the people of this Commonwealth.

73 P.S. § 201-2(3). Reading Section 3 in light of this definition, the UTPCPL prohibits unfair and deceptive practices in the conduct of "the advertising, offering for sale, sale or distribution" of goods. *Id.*; 73 P.S. § 201-3. Thus, the legislature chose to define trade and commerce as only acts of selling for purposes of the UTPCPL, even though the ordinary meaning of those terms signifies both buying and selling goods. *Accord* 73 P.S.

§ 201-2(4) (defining unfair and deceptive acts as sellers' conduct). We may not disregard this policy choice. *See Massini*, 188 A.2d at 817 ("The legislature may create its own dictionary, and its definitions may be different from ordinary usage. When it does define the words used in a statute, the courts need not refer to the technical meaning and deviation of those words as given in dictionaries, but must accept the statutory definitions."). Defining trade and commerce exclusively as acts of sellers aligns with and effects the legislative purpose of protecting consumers by "equaliz[ing] the market position and strength of the consumer vis-à-vis the seller[]" and deterring sellers from using unfair, deceptive, and fraudulent practices. *Monumental Props.*, 329 A.2d at 820.

The Commonwealth Court erred in discarding the specialized legislative definition of trade and commerce and substituting the dictionary definitions of those terms. To do so, the Commonwealth Court held that the second part of the Section 2(3) trade and commerce definition—"and includes any trade or commerce directly or indirectly affecting the people of this Commonwealth"—is a "catch-all of sorts, enabling ''trade' and 'commerce'' to be defined in terms of common usage and not just . . . through the narrower, more specific language of the first clause." *Anadarko Petroleum*, 206 A.3d at 57. This was flawed for several reasons.

First, the Commonwealth Court failed to recognize that the first part of Section 2(3) contains the definitions of trade and commerce. When the phrase "trade or commerce" appears in the second part of Section 2(3), it carries the specialized meaning of "the advertising, offering for sale, sale or distribution . . ." contained in the first part. 73 P.S. § 201-2(3); *see also Ratzlaf*, 510 U.S. at 143 ("[a] term appearing in several places in a statutory text is generally read the same way each time it appears."). Because the legislature first defined trade and commerce and then used the terms again, the

Commonwealth Court could not disregard the legislature's definition in favor of a dictionary definition.

Second, defining trade and commerce to include both buying and selling renders superfluous the first part of the definition, which defines trade and commerce as only selling. This violates the statutory construction principle that "[w]e are not permitted to ignore the language of a statute, nor may we deem any language to be superfluous." *Commonwealth v. McCoy*, 962 A.2d 1160, 1168 (Pa. 2009). In fact, resorting to a dictionary or ordinary usage for the definition of trade and commerce ignores and renders superfluous the very legislative act of providing a definition for those terms. We presume the legislature was aware of the ordinary meanings of trade and commerce and chose to define those terms more precisely for purposes of the UTPCPL. If the legislature intended for trade and commerce to be defined using a dictionary or their ordinary meaning, it would not have specially defined them in Section 2(3). *See Commonwealth v. Hart*, 28 A.3d 898, 909 (Pa. 2011) (using dictionary to ascertain the common and approved usage of a term the legislature did not define); *Centolanza v. Lehigh Valley Dairies, Inc.*, 658 A.2d 336, 340 (Pa. 1995) ("Absent a definition in the statute, statutes are presumed to employ words in their popular and plain everyday sense, and the popular meaning of such words must prevail.").

Third, the Commonwealth Court misapplied *Monumental Properties* to hold that the UTPCPL regulates both the buyer and seller in a lease transaction. *See Anadarko Petroleum*, 206 A.3d at 58 n.12 (finding the oil and gas lease constituted "sales" as used in Section 2(3)). This was an unsupported expansion of *Monumental Properties*. The *Monumental Properties* Court held that "the leasing of residences falls within the ambit of the Consumer Protection Law." *Monumental Props.*, 329 A.2d at 820 ("the contemporary leasing of residences envisions are person (landlord) exchanging for periodic payments

of money (rent) a bundle of goods and services, rights and obligations."). It, however, did not hold that the UTPCPL regulates the conduct of both landlord and tenant. Instead, it explained "[t]he Legislature directed that consumers were to be safeguarded by the [UTPCPL,]" and "tenants are in every meaningful sense consumers." *Id.* at 826. Applying *Monumental Properties* to this case, assuming commercial oil and gas leases are subject to the UTPCPL,[9] the UTPCPL provides protection to the consumer/purchaser, which is Anadarko in this case, from unfair and deceptive practices of the sellers, which are landowners in this case. Accordingly, *Monumental Properties* does not support the Commonwealth Court's conclusion that Anadarko, as a lessee, was subject to the UTPCPL.

Fourth, the Commonwealth Court's interpretation was premised on its misreading of *Danganan*. In *Danganan*, this Court granted the Third Circuit's request for certification of the state law question of whether a non-Pennsylvania resident could bring a UTPCPL claim against a Pennsylvania business arising out of transactions that occurred outside of Pennsylvania. *Danganan*, 179 A.3d at 11-12. The class action lawsuit in *Danganan* involved UTPCPL claims of out-of-state consumers who contracted with a Pennsylvania-headquartered business for home security services at their out-of-state homes. *Id.* at 10. In deciding those UTPCPL claims were legally cognizable, the *Danganan* Court observed that the UTPCPL Section 2 definitions of "person," "trade," and "commerce" "evidence no geographic limitation or residency requirement relative to the Law's application." *Id.* at 16. Regarding the second part of the Section 2(3) definition of trade and commerce, this Court observed:

---

[9] Because our conclusion that Anadarko was not in the position of a seller for purposes of the UTPCPL resolves this case, we do not address the broader issue of whether the UTPCPL applies to commercial business transactions. *See supra* n.7 and accompanying text.

> Although the trade and commerce definition includes a clause relating to conduct that 'directly or indirectly affect[s] the people of this Commonwealth,' that phrase does not modify or qualify the preceding terms. 73 P.S. § 201-2(3). Instead, it is appended to the end of the definition and prefaced by 'and includes,' thus indicating an inclusive and broader view of trade and commerce than expressed by the antecedent language.

*Id.* Based on this construction, the liberal interpretation of the UTPCPL, and a Washington Supreme Court case, we held that a non-Pennsylvania resident may bring a UTPCPL claim against a Pennsylvania business based on an out-of-state transaction. *Id.* at 16-17 (relying on *Thornell v. Seattle Serv. Bureau, Inc.*, 363 P.3d 587, 591 (Wash. 2015) (suggesting unfair and deceptive business practices against nonresidents directly and indirectly affect the state economy)).

Contrary to the Commonwealth Court's reading, the *Danganan* Court did not conclude that the second part of Section 2(3) altered the first part's definition of trade and commerce. *Id.* at 16. Nor did this Court conclude that the second part of Section 2(3) operated as a "catch-all" to expand the meaning of trade and commerce beyond what the legislature specified in the first part. Instead, the *Danganan* Court said it was "inclusive," *i.e.*, included the first part, and "broader" in that it applied to conduct "directly or indirectly affecting the people of this Commonwealth." *Id.* Based on *Danganan*'s statement that the second part of Section 2(3) "does not modify or qualify the preceding terms," we conclude the Commonwealth Court erred in using the second part of Section 2(3) to redefine trade and commerce by expanding it to include buying as well as selling.

Applying the plain language of the Section 2(3) definition of trade and commerce to this case, we conclude the OAG's UTPCPL claims against Anadarko are not legally cognizable. In the oil and gas lease transactions at issue, Anadarko was in the position of a buyer, purchasing rights to the landowners' mineral estates. In turn, the landowners were in the position of a seller, conveying their rights in exchange for signing bonuses,

royalty payments, and other considerations. While the OAG's second amended complaint alleged Anadarko engaged in unfair and deceptive conduct in these transactions, Anadarko was not conducting "trade or commerce" for the purposes of the UTPCPL because it was not engaged in "the advertising, offering for sale, sale or distribution" of anything; instead, it was purchasing oil and gas interests from landowners. Both the Commonwealth Court and the OAG recognized that Anadarko was in the position of a buyer/consumer in the oil and gas lease transactions. *See Anadarko Petroleum*, 206 A.3d at 58 ("Appellants have, by virtue of leasing subsurface mineral rights, purchased time-limited rights to whatever natural gas is situated underneath the private landowners' properties."); Second Amended Complaint, 5/3/16, at ¶¶ 71 (averring oil and gas exploration and production companies acquired oil and gas rights); 79 (stating landowners conveyed mineral estates); 271 (averring Anadarko obtained oil and gas leases from landowners).[10] Section 3 of the UTPCPL simply does not regulate buyers' conduct in commercial transactions. 73 P.S. § 201-3.

---

[10] The dissent agrees that in the leasing transaction, "the landowner conveyed a fee simple determinable in the mineral estate for a term of years to Anadarko in exchange for a combination of royalty and bonus payments." Dissenting Op. at 5-6. Despite this, the dissent engages in a creative attempt to shoehorn this transaction into the UTPCPL by asserting Anadarko was actually offering its oil and gas production services to the landowner. *Id.* at 6. In support, the dissent points to a single lease the OAG provided as an example of a subset of leases that were silent on the issue of costs being deducted from royalty payments. *Id.* at 7; *see also* Second Amended Complaint, 5/3/16, at ¶ 83 n.13. The dissent claims that lease required Anadarko to commence drilling and to pay royalties to the landowner when the wells are not producing. Dissenting Op. at 7-8 (citing Second Amended Complaint, 5/3/16, at Ex. Q). However, the dissent's parenthetical explanation of the lease terms acknowledges that Anadarko was not required to commence drilling during the lease's primary term. *Id.* Further, the terms of the lease confirm that it did not require Anadarko to take any actions to conduct oil and gas production operations on the property. Second Amended Complaint, 5/3/16, at Ex. Q. Specifically, the lease provided "[u]nless sooner terminated or longer kept in force under other provisions hereof, this lease shall remain in force for a term of seven (7) years from the date hereof, hereinafter called 'primary term[;'] and as long thereafter as operations, as hereinafter defined, are conducted upon said land with no cessation for more than

Because the OAG's claims are not cognizable under Section 3, we are not persuaded by the OAG's contention that it can nonetheless bring enforcement actions against any person pursuant to UTPCPL Section 4. Section 4 plainly provides that the OAG has standing to bring an action only if that person "is using or is about to use any method, act or practice declared by section 3 of this act to be unlawful[.]" 73 P.S. § 201-4. Thus, Section 4 does not alter the Section 3 UTPCPL cause of action, or create an independent cause of action, when the Commonwealth brings the action. Because we have concluded that the OAG's averments in the second amended complaint do not plead a violation of Section 3, the OAG cannot bring a claim under Section 4. Accordingly, the OAG's UTPCPL claims against Anadarko are legally insufficient.

## V. LEGAL SUFFICIENCY OF UTPCPL ANTITRUST CLAIMS

The second issue we accepted for review, whether antitrust remedies are cognizable under the UTPCPL, is contingent on a finding that the OAG can bring claims against Anadarko under the UTPCPL. Because we have concluded that the OAG cannot bring UTPCPL claims against Anadarko based on its allegedly unfair and deceptive conduct as a purchaser of mineral estates, the OAG's antitrust claims in Count IV are also legally insufficient. *Accord Anadarko Petroleum*, 206 A.3d at 66 n.5 (Covey, J.,

ninety (90) consecutive days." *Id.* at ¶ 2. Further, that lease entitled the landowner to a "spud fee" of $25,000.00 if Anadarko commenced drilling, but provided that "[i]n the event a drilling rig does not commence drilling on said lands within the term of the lease as specified in paragraph three (3), the lease shall expire and no spud fee shall be tendered nor due." *Id.* at ¶ 12. Similarly, the lease provided that Anadarko would pay the landowner $35.00 per acre if a well was not drilled on the property but the land was utilized in a unit containing a drill site, but stated "[i]n the event a drilling rig does not commence drilling on said unitized lands within the terms of the lease as specified in paragraph three (3), lease shall expire and no unitized drilling fee shall be tendered nor due." *Id.* at ¶ 13. Additionally, Anadarko incurred the obligation to pay royalties to the landowner when the wells were not producing, but no lease term required Anadarko to drill any wells on the property. *Id.* at ¶ 4; *see also id.* at ¶ 12 (providing the lease can expire without drilling). Accordingly, that lease does not support the dissent's position that Anadarko was offering its oil and gas production services to landowners because the lease did not require Anadarko to conduct any oil and gas operations.

concurring and dissenting) (opining Count IV "must also be dismissed since [Anadarko's] conduct, as purchasers, does not fall within the UTPCPL's definition of 'trade' and 'commerce.'"). Thus, the second question is now moot. *See Danganan*, 179 A.3d at 17 (finding that the resolution of the first question mooted the second question certified for review); *In re Gross*, 382 A.2d 116, 119 (Pa. 1978) ("It is well established in this jurisdiction that this Court will not decide moot questions.").

## VI. CONCLUSION

For these reasons, we conclude the OAG may not bring claims under the UTPCPL on behalf of private landowners against Anadarko for its alleged unfair and deceptive practices in acquiring natural gas leases from the landowners. We further find that our resolution of the first issue renders the second issue moot. Accordingly, we affirm in part and reverse in part the Commonwealth Court's decision. We affirm the portion of the Commonwealth Court's decision that reversed the trial court order overruling Anadarko's preliminary objections to Count III of the OAG's second amended complaint, and we otherwise reverse the order of the Commonwealth Court.

Case remanded. Jurisdiction relinquished.

Chief Justice Saylor and Justices Baer, Todd, Donohue and Wecht join the opinion.

Justice Dougherty files a dissenting opinion.