**[J-52A-2020] [MO: Mundy, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | No. 81 MAP 2019 |
| | : | |
| | : | Appeal from the Order of the |
| v. | : | Commonwealth Court at No. 58 CD |
| | : | 2018 dated March 15, 2019 |
| | : | Affirming in Part and Reversing in |
| CHESAPEAKE ENERGY CORPORATION; | : | Part the Order of the Bradford |
| CHESAPEAKE APPALACHIA, L.L.C.; | : | County Court of Common Pleas, |
| CHESAPEAKE OPERATING, L.L.C.; | : | Civil Division, at No. 2015IR0069 |
| CHESAPEAKE ENERGY MARKETING, | : | dated December 15, 2017 and |
| L.L.C.; ANADARKO PETROLEUM | : | Remanding. |
| CORPORATION; AND ANADARKO E&P | : | |
| ONSHORE, L.L.C. | : | ARGUED:  May 27, 2020 |
| | : | |
| | : | |
| | : | |
| APPEAL OF:  ANADARKO PETROLEUM | : | |
| CORPORATION; AND ANADARKO E&P | : | |
| ONSHORE, L.L.C. | : | |

**DISSENTING OPINION**

**JUSTICE DOUGHERTY**                              **DECIDED:  March 24, 2021**

I conclude appellants Anadarko Petroleum Corporation and Anadarko E&P Onshore LLC (Anadarko) were engaged in "trade or commerce" such that their conduct may be actionable under Section 3 of the Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§201-1 - 201-10 (UTPCPL), and that antitrust violations can give rise to UTPCPL claims to the extent they fall within the statute's definitions of "unfair methods of competition" or "unfair or deceptive acts or practices."  I would thus affirm the decision of the Commonwealth Court.

**I. The UTPCPL's Definition of "Trade or Commerce"**

Anadarko is a natural gas exploration and production company that entered into leases — via its agents or so-called "landmen"[1] — with Pennsylvania landowners in the Marcellus Shale region. We are asked whether Anadarko engaged in "trade or commerce" such that it may be held liable for violating Section 3 of the UTPCPL, which prohibits: "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" 73 P.S. §201-3. Section 2 of the statute defines "trade" and "commerce" as "the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and includes any trade or commerce directly or indirectly affecting the people of this Commonwealth." *Id.* at §201-2(3).

I agree with the Majority's conclusion the definition of "trade" and "commerce" is limited to the conduct articulated in Section 2's definition and that the Commonwealth Court's attempt to expand that definition based on our analysis in *Danganan v. Guardian Protection Servs.,* 179 A.3d 9 (Pa. 2018)*,* was erroneous. *See* Majority Opinion, slip op. at 19-24. I disagree, however, with the Majority's ultimate holding that "Anadarko was not conducting 'trade or commerce' for the purposes of the UTPCPL because it was not engaged in 'the advertising for sale, sale or distribution' of anything; instead it was purchasing oil and gas interests from landowners." *Id.* at 24. In my view, Anadarko, through the actions of its agents, was engaged in "trade or commerce" when it affirmatively sought out landowners and offered for sale to them their natural gas exploration and drilling services. Unlike the Majority, my interpretation is consistent with

---

[1] The term "landman" apparently refers to Anadarko's leasing agents, and is defined as "an agent who works for an exploration and production company or who is contracted by an exploration and production company or broker to negotiate with landowners to enter into a lease for the exploration and production of natural gas." Second Amended Complaint, 5/3/2016, at ¶32. At times, I refer to landmen as Anadarko's leasing agents.

our mandate to liberally construe the UTPCPL to achieve its objective of preventing unfair and deceptive practices. *See Commonwealth, by Creamer v. Monumental Props., Inc.*, 329 A.2d 812, 817 (Pa. 1974).

Before the UTPCPL was enacted, common law governed transactions between a merchant and consumer and "largely presumed that a consumer and merchant stand at arms-length in reaching their bargain, failing to recognize that the average consumer relies in great part on a merchant's advanced knowledge concerning the goods and services at issue, and thus failed to protect against numerous unfair and deceptive business practices arising from such reliance." *Meyer v. Cmty. Coll. of Beaver Cty.*, 93 A.3d 806, 811 (Pa. 2014). The General Assembly enacted the UTPCPL specifically to eliminate "the unequal bargaining power of opposing forces in the marketplace" and "place on more equal terms seller and consumer." *Monumental Props.*, 329 A.2d at 815-16; *see also Danganan*, 179 A.3d at 16 (UTPCPL designed to address a wide range of conduct "including equalizing the bargaining power of the seller and consumer, ensuring the fairness of market transactions, and preventing deception and exploitation, all of which harmonize with the statute's broad underlying foundation of fraud prevention). The statute is thus a remedial one designed to "benefit the public at large by eradicating, among other things, 'unfair or deceptive' business practices." *Monumental Props.*, 329 A.2d at 815. Consistent with the statute's remedial purpose, we must liberally construe its terms "so as to 'effect its object of preventing unfair or deceptive practices[.]'" *Danganan*, 179 A.3d at 16, *quoting Monumental Props.*, 329 A.2d at 817; *see also Monumental Props.*, 329 A.2d at 816 ("This Court emphatically stated in *Verona v. Schenley Farms Co.*, 167 A. 317, 320 (1933), '[a]s a statute for the prevention of fraud, it must be liberally construed to effect the purpose[.]'").

According to the Commonwealth's complaint,[2] Anadarko is engaged in the business of "exploration, drilling, extraction, gathering, compression, transportation and sale of natural gas." Second Amended Complaint, 5/3/2016, at ¶30. In furtherance of those objectives, Anadarko "deployed [l]andmen to obtain oil and gas leases from [] [l]andowners owning land over commercially viable Marcellus Shale gas play." *Id.* at ¶¶271-72; *see also id.* at ¶¶70, 72 (Exploration and production companies "leveraged" their access to "proprietary geological information to identify the commercially viable core of the Marcellus Shale" and then identified the owners of parcels of land in that area to secure lease agreements). Anadarko "empowered" these landmen to make certain representations and engage in "sales pitch[es]" that were designed to encourage landowners to sign the leases. *Id.* at ¶¶273-75. Specifically, the landmen were "deployed" throughout the region "knocking, often unannounced and unscheduled, on the door of a [l]andowner's house to pitch an oil and gas lease[.]" *Id.* at ¶283. According to the complaint, these agents of Anadarko made the following representations:

a. Stating that if anyone in the drilling unit were to sign the lease now, the money would be placed in escrow for future payment; otherwise, if anyone signed later, such person would lose out on the money or otherwise receive much less;
b. Representing that all the neighbor properties were leased and the gas company would drill to capture the gas whether the landowner signed or not;
c. Stating that if the landowner did not sign the lease that day, it would be the landowner's last chance to sign and the gas company would extract the gas one way or another;
d. Telling a landowner an attorney was not necessary when signing a lease because the landowner would get 12.5% royalty because that was the law in Pennsylvania;
e. Telling a landowner, in response to a question about the possibility of the price per acre increasing, that the price per acre for signing bonus does not increase despite knowing that it may;

---

[2] In this appeal from a decision sustaining preliminary objections in the nature of a demurrer, we accept as true all well-pleaded material facts alleged in the complaint and every inference fairly deducible therefrom. *Ladd v. Real Estate Comm'n*, 230 A.3d 1096, 1103 (Pa. 2020).

f. Showing landowners copies of spreadsheets called "royalty calculators," which reflect how much money a landowner can expect to make in royalty payments each year over a twenty year period based on the number of acres in production and the price of gas, with no references to deductions; and

g. Charging a landowner deductions for compression when such service was not being done.

*Id.* at ¶275. *See also id.* at ¶¶276, 294 (alleging Anadarko authorized Chesapeake Energy Corporation to make similar "misrepresentations" to landowners pursuant to their joint venture agreement).[3]

The complaint further alleged the landmen presented landowners with oil and gas leases that were prepared and authorized by Anadarko. *Id.* at ¶¶282-83 (leases presented by landmen to landowners at direction of Anadarko); *id.* at ¶¶285-86 (consumers lack sophistication regarding oil and gas leases and payment structures while exploration and production companies are sophisticated and well-versed in drafting "industry-specific oil and gas lease terms"). In some cases, landowners were able to negotiate with landmen to obtain more favorable terms, but there were other terms in Anadarko's contracts that could prevent those concessions from taking effect. *See id.* at ¶100 (exploration and production companies gave permission to amend standard leases "depending on the value of the land owned by the hard-bargaining landowner"); *id.* at ¶293 (Anadarko knew other language in the contract would negate any concessions "giving [the landowner], who bargained hard for it, a hollow victory"). In the event the parties reached an agreement, the landowner conveyed a fee simple determinable[4] in the

---

[3] On June 28, 2020, Chesapeake Energy Corporation filed for Chapter 11 bankruptcy. Chesapeake was subsequently severed from this appeal following a decision by the United States Bankruptcy Court for the Southern District of Texas granting Chesapeake's emergency motion for entry of an order enforcing an automatic stay against the Attorney General. *See* Order dated 8/26/2020 at 2 (*per curiam*).

[4] A fee simple determinable is an estate in fee that automatically reverts to the grantor upon the occurrence of a specific event. *T.W. Phillips Gas & Oil Co. v. Jedlicka*, 42 A.3d 261, 267 (Pa. 2012).

mineral estate for a term of years to Anadarko in exchange for a combination of royalty and bonus payments. *Id.* at ¶283; *see also id.* at ¶77-78 ("fee simple determinable for the mineral estate operates to sever the ownership of certain minerals from the ownership of the surface of the land").

On these facts, which we accept as true at the preliminary objections stage, I would hold there is at least a colorable claim that Anadarko engages in actionable "trade or commerce" when it directs its agents to offer, negotiate and finalize leases with Pennsylvania landowners with the express purpose of engaging in natural gas exploration and drilling on their property. As stated, the UTPCPL defines "trade" and "commerce," in relevant part, as "the advertising, offering for sale, sale or distribution of **any services**." 73 P.S. §201-2(3) (emphasis added).[5] In my view, Anadarko's very existence is to perform a specialized service not otherwise available to most ordinary landowners, *i.e.*, the exploration, development and production of oil and gas from beneath their land. Through its agents, Anadarko utilizes proprietary information to target particular landowners, authorizes unannounced solicitation of those landowners, and engages in "sales pitch[es]" that induced landowners to sign the leases immediately, or risk losing out on large pay-days, through use of one-sided, pre-approved leases. *See* Second Amended Complaint, 5/3/2016, at ¶¶273-75, 282-83. In other words, Anadarko initiates the contact, makes the offer of a lease, and largely controls the terms of that offer. Our consideration of these allegations is colored by our mandate to construe the UTPCPL

---

[5] The *en banc* panel below concluded Anadarko's leases were "sales" under the UTPCPL and thus did not consider whether the "leases constitute 'trade or commerce' because they qualify as 'distribution of services.'" *Anadarko Petroleum Corp. v. Commonwealth*, 206 A.3d 51, 58 n.12 (Pa. Cmwlth. 2019). I would affirm on the alternate basis that Anadarko was engaged in "trade or commerce" when it offered its oil and gas production services to Pennsylvania landowners. *See Commonwealth v. Tighe*, 224 A.3d 1268, 1279-80 (Pa. 2020) ("[T]his Court can affirm if the lower tribunal's decision was correct for any other reason supported by the record.").

liberally to "'effect its object of preventing unfair or deceptive practices[.]'" *Danganan*, 179 A.3d at 16, *quoting Monumental Props*., 329 A.2d at 817.

The Majority posits Anadarko is the buyer in these transactions because at the end of the day, Anadarko purchases a fee simple estate in the natural gas. *See* Majority Opinion, slip op*.* at 23-24. But, focusing on the transaction's end result while largely ignoring the purpose and method of Anadarko's door-to-to sales tactics undermines the remedial purpose of the UTPCPL. *See Monumental Props*., 329 A.2d at 815-816 (UTPCPL is designed to "place on more equal terms seller and consumer"). The transaction's *de jure* outcome should not be allowed to obfuscate the *de facto* circumstances of the deal.

It is clear that the business of oil and gas leases is unique in the larger commercial context, and that such leases are "far from the simplest of property concepts." *T.W. Phillips Gas & Oil Co. v. Jedlicka*, 42 A.3d 261, 267 (Pa. 2012) (recognizing unique characteristics of oil and gas leases). It is also clear, however, that the leases are reciprocal — that is, they benefit both the oil and gas production company and the landowner. *Cf. id.* at 268 (Oil and gas leases remain in effect for as long as oil or gas is produced "in paying quantities"; that clause historically "was regarded as for the benefit of the lessee, as a lessee would not want to be obligated to pay rent for premises which have ceased to be productive, or for which the operating expenses exceed the income. More recently, however . . . these clauses are relied on by landowners to terminate a lease."). Here, despite the fact that executed leases result in Anadarko owning a fee simple determinable in the mineral estate, the very terms of the lease make clear Anadarko is required to develop and produce oil for the landowners' benefit. *See* Second Amended Complaint, 5/3/2016, Exhibit Q (lease requires drilling to commence within the primary term, *i.e.*, the period of time before the lease vests into a fee simple determinable,

or the lease expires and a fee simple interest is not acquired; should drilling commence, the lease requires payments to landowner when wells are not producing). Anadarko may technically be a "buyer" of oil and gas the landowner is "selling," but the nature of this marketplace involves what I consider to be hybrid transactions. Anadarko is not in the position of a consumer who simply purchases an article of clothing in a department store, and I would not read the UTPCPL so strictly that Anadarko's conduct as described in the complaint should escape the statute's restrictions as a matter of law. *See Monumental Props.*, 329 A.2d at 826 ("To refuse to apply the [UTPCPL] to the leasing of residential housing would needlessly insulate a great percentage of market transactions from the [the statute's] salutary antifraud provisions.").

Additionally, I am mindful of the significant power differential that often exists in these transactions. *See id.* at 815-16 (UTPCPL designed to eliminate "the unequal bargaining power of opposing forces in the marketplace" and "place on more equal terms seller and consumer"). Anadarko and its *amici* argue the landowners are not powerless, and actually retained significant leverage because they are able to bargain for changes to the terms of the contracts and able to decline the contract entirely. *See e.g.*, Marcellus Shale Coalition Amicus Brief at 6 (oil and gas lease negotiations are "not the 'David v. Goliath' scenario the Commonwealth paints" because landowner holds "considerable bargaining power" by holding property the "potential lessee wishes to obtain and can simply refuse to enter into the lease if the terms are not satisfactory"). But I disagree. Anadarko's superior knowledge of the market in the Marcellus Shale region along with its sophistication in oil and gas lease agreements may consistently tip the scales in their favor throughout the negotiation process. Moreover, producers have the advantage of being insulated from trespass actions when they take gas from under the property of owners who refuse to "play ball" — the producers need only obtain leases on the

neighboring land. *See, e.g.*, *Briggs v. Southwestern Energy Prod. Co.*, 224 A.3d 334, 352 (Pa. 2020) (rule of capture remains in effect and natural gas developers who use hydraulic fracturing "may rely on pressure differentials to drain oil and gas from under another's property . . . in the absence of a physical invasion"). I would therefore affirm the Commonwealth Court's holding that the claims set forth in the Second Amended Complaint may be actionable under the UTPCPL.

## II. Antitrust Claims Under The UTPCPL

Because I conclude Anadarko's conduct as described in the complaint may be actionable under the UTPCPL, I would proceed to consider the second question we accepted for review: "May the Commonwealth pursue antitrust remedies under the [UTPCPL]?" *Commonwealth v. Chesapeake Energy Corp.*, 218 A.3d 1205 (Pa. 2019) (*per curiam*). My view of the issue largely aligns with the analysis of the panel below, and I would thus affirm its holding with respect to this issue as well. *See Anadarko*, 206 A.3d at 59-61 (monopolistic behaviors, *e.g.*, joint ventures and market sharing agreements may give rise to viable UTPCPL claim if "they fit within one of the categories of behavior deemed, by rule or in the Law itself, 'unfair methods of competition' or 'unfair or deceptive acts or practices'"; Count IV of the Second Amended Complaint raises such a claim, but Count III does not).